Strafford County Probate Court
No. 82-014

*In re* JOHN AND JANE DOE

August 31, 1983

*Dickson, Fauver & Cooper*, of North Conway (*Randall F. Cooper* on the brief and orally), for the New Hampshire Division of Welfare.

*McManus & Johnson*, of Dover (*Anthony A. McManus* on the brief and orally), for John and Jane Doe.

BATCHELDER, J. This appeal was brought seeking to reverse an order of the Strafford County Probate Court (*Shea*, J.) approving a master's report recommending that the parental rights of John and Jane Doe, with respect to their two minor children, Sally and Joe, be terminated, and that legal custody be vested in the New Hampshire Division of Welfare. For the reasons which follow, we vacate the court's ruling in part, and remand for findings in regard to Jane Doe which are in accordance with this opinion.

The factual findings in cases involving the termination of parental rights are critical to the appellate review process. *See generally* C. DOUGLAS, 3 NEW HAMPSHIRE PRACTICE, FAMILY LAW, ch. 20 (1982). A recapitulation of the important factual findings, although not necessarily enlarging the precedential scope of cases such as this, may provide guidance for future examination by triers of fact in this difficult area of law. Accordingly, we note the unfortunate factual background of this case.

I. *Facts*

John and Jane Doe were married in November 1975. Their first child, Sally, was born in February 1977. The record reveals that in July 1977, Sally, then five months old, was admitted to a hospital emergency room suffering from an abrased throat. According to the emergency room notes, Mr. Doe admitted that while washing Sally's face he had become angry and forced a washcloth into the baby's throat. At that time, a child abuse report on the incident was filed with the division of welfare. Although Sally was returned to her parents' custody, Mr. and Mrs. Doe assured the division investigator that they would arrange for outside care for Sally while they resolved their problems through counseling. Nevertheless, Sally remained with her parents.

Five months later, on December 31, 1977, the local police department forwarded a complaint to the division regarding another incident of abuse at the Doe home. The complaint alleged that Mr. Doe broke Sally's arm and refused to take her to the hospital for treatment. The investigation that followed revealed that Mrs. Doe was not home at the time of the incident, that when she returned home Sally was screaming in her crib, and that upon lifting the child she discovered that one of Sally's arms was completely limp. Mrs. Doe stated that Mr. Doe was angry about her discovery and would not permit her to take the child to the hospital. After this incident, a local police officer and a worker from the division of welfare visited the Doe home, and Sally was taken into police custody pursuant to section 5 of chapter 502 of the 1975 session laws (current version at RSA 169-C:6 (Supp. 1981)). In January 1978, an emergency custody hearing was held which resulted in Sally's being placed in the custody of the division of welfare, and she was transferred to a licensed foster home. The division has retained custody of Sally since that date.

Joe Doe was born on March 13, 1978. Mr. and Mrs. Doe made arrangements prior to Joe's birth to have him placed in foster care rather than to bring him home from the hospital. Except for a few visits with his parents, Joe has lived in a foster home since his release from the hospital.

Ostensibly, the decision to relinquish custody of Joe was based upon a plan by the Does to continue counseling in order to rehabilitate the family in the future. The record indicates that over the next two years Mr. and Mrs. Doe took part in various types of counseling and parent training, including psychotherapy with a licensed psychiatrist, Doctor Carolyn Dixon. A report, for which Mr. and Mrs. Doe signed releases to the division of welfare, was prepared by Dr. Dixon and was used as support for the master's decision to terminate parental rights pursuant to RSA 170-C:5, IV (Supp. 1981).

The record reveals that since January 1978 the division of welfare has made efforts to return the children to the parents and has provided, or attempted to provide, applicable services toward that result. Those efforts failed. Custody of Joe and Sally was never returned to their parents, and visitations have been erratic. In late 1979, the division of welfare instituted petitions against the Does to terminate parental rights on the basis of neglect. See RSA 170-C:5, III. Although the record before us is not clear in this regard, the neglect petitions were not pursued to final disposition, apparently to afford Mr. and Mrs. Doe the opportunity to improve their abilities to be capable parents.

Despite these efforts, in December 1980 the division of welfare filed the amended petitions to terminate parental rights from which this appeal arises. These amended petitions alleged that "because of mental deficiency or mental illness, . . . [John and Jane Doe] . . . are and will continue to be incapable of giving to their natural children, [Sally and Joe], proper parental care and protection for a longer period of time than would be wise or prudent to leave these children in an unstable and impermanent environment." *See* RSA 170-C:5, IV (Supp. 1981).

In the fall of 1981, hearings on the petitions were held before a Master (*Lichman*, J.), who was specially appointed pursuant to RSA 547:37. The division of welfare submitted both written and oral testimony by two psychiatrists which diagnosed both Mr. and Mrs. Doe as suffering from personality disorders which prevented them from being able to provide proper parental care and protection.

Specifically, Mr. Doe was diagnosed as suffering from a schizoid disorder. It was conceded, however, that both parents are of at least average intelligence, and that Mr. Doe is capable of adequately supporting his family. Both parents are regular church members and participate in various church activities and programs. Neither parent is in need of hospitalization and neither parent is taking or is in need of medication.

Daniel Williams, a State-certified psychologist, appeared on behalf of the division in the hearings before the probate master, and testified that the child Sally suffered from behavioral problems allegedly resulting from her parents' inability to care properly for her due to the fact that they both suffered from mental illness. Williams' testimony also indicated that Joe, an otherwise happy and secure child, became upset to such an extent whenever he visited his parents that it was detrimental for him to do so. The division's testimony also suggested that the parents' conduct was inconsistent with a reliable and secure home environment, that the parents lacked stability, and that they feared the return of the children to their home.

The record in this case included a "social study" prepared by a division social worker who had been closely involved with the family. The conclusions of this study were that the children "have a tremendous need for long-term, permanent attachments to develop a sense of security and stability," and that both children were excellent candidates for adoption and that the best interests of the children would be served by terminating the Does' parental rights so that they may be placed in adoptive homes as soon as possible.

Moreover, the guardian ad litem for the children recommended that the status quo at the time of the hearing be preserved; that is,

that the children should remain outside their parents' home and in the custody of the division of welfare.

At the conclusion of these hearings, the master issued a report and recommended decree terminating the parental rights of John and Jane Doe. The decree was approved by the probate judge, and the parents brought this appeal.

## II. *Law*

Against this factual background we are called upon to make a determination as a matter of law whether this record supports the unequivocal termination of parental rights of both parents with respect to each child. The division's petitions in this case were based upon RSA 170-C:5, IV (Supp. 1981), which provides that parental rights may be terminated if the court finds that:

> "[b]ecause of mental deficiency or mental illness, the parent is and will continue to be incapable of giving the child proper parental care and protection for a longer period of time than would be wise or prudent to leave the child in an unstable or impermanent environment. Mental deficiency or mental illness shall be established by the testimony of either 2 licensed psychiatrists or clinical psychologists or one of each acting together."

John and Jane Doe contend that they do not suffer from mental illness as contemplated by the legislature when it enacted RSA 170-C:5, IV (Supp. 1981). They urge us to construe the term "mental illness" in that statute to have the same meaning it has in RSA 135-B:2, XI (Supp. 1981) regarding involuntary civil commitment to New Hampshire Hospital. That latter statutory section defines "mental illness" as follows:

> "[A] substantial impairment of emotional processes, or of the ability to exercise conscious control of one's actions, or of the ability to perceive reality or to reason, which impairment is manifested by instances of extremely abnormal behavior or extremely faulty perceptions; it does not include impairment primarily caused by: (a) epilepsy; (b) mental retardation; (c) continuous or noncontinuous periods of intoxication caused by substances such as alcohol or drugs; (d) dependence upon or addiction to any substance such as alcohol or drugs."

The legislature, in enacting RSA 170-C:5, IV (Supp. 1981), had the opportunity to adopt such a definition, but failed to do so. Nothing in the legislative history of RSA 170-C:5, IV (Supp. 1981) or

in the arguments advanced by the Does persuades us that the definition of "mental illness" contained in RSA 135-B:2, XI (Supp. 1981) should be ascribed to the statute terminating parental rights on the basis of mental illness.

In the alternative, the parents have alleged that the legislation providing for the termination of parental rights on the basis of mental illness is vague in that the statute provides no ascertainable guidelines for determining what conduct will result in termination of parental rights on the basis of mental illness. This argument warrants careful consideration in light of the nature of the parental relationship which may be subject to termination pursuant to RSA chapter 170-C.

■■■ We have recognized that the parent-child relationship is a fundamental liberty interest clothed with constitutional protections. *State v. Robert H.* _____, 118 N.H. 713, 715, 393 A.2d 1387, 1388–89 (1978). In so holding, we have required the State to prove its case for the termination of parental rights beyond a reasonable doubt. *Id.* at 716, 393 A.2d at 1389. Nevertheless, the dominant consideration in termination proceedings under RSA chapter 170-C is the welfare of the child, which must prevail over the interests of the parents. *In re Fay G.*, 120 N.H. 153, 156, 412 A.2d 1012, 1015 (1980). The fundamental rights of parents are not unassailable, and terminations will be upheld if applicable due process requirements have been met. *See In re Irene W.*, 121 N.H. 123, 125–26, 427 A.2d 24, 26 (1981).

■■■ Statutory constraints on fundamental liberties, such as the family relationship, are examined for intent and substance, as well as for definiteness or certainty of expression. *See Kolender v. Lawson*, 103 S. Ct. 1855, 1858 (1983). Due process requires that a statute proscribing conduct not be so vague as to fail to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *State v. Albers*, 113 N.H. 132, 133, 303 A.2d 197, 199 (1973); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In the past few years, statutes setting forth conditions for the termination of parental rights have been attacked on such vagueness grounds in other jurisdictions. *See generally* D. Day, *Termination of Parental Rights Statutes and the Void for Vagueness Doctrine: A Successful Attack on the Parens Patriae Rationale*, 16 J. FAM. L. 213 (1977–78).

■■■ The Does correctly assert that "to hold merely that inadequate parenting, absent specific harm to the children, is sufficient to terminate parental rights in the 'best interest of the child' is too vague a concept and places undue emphasis on the parental conduct

rather than on any harm to the child." *State v. Robert H.* _____, 118 N.H. at 718, 393 A.2d at 1390; *see also Alsager v. District Court,* 406 F. Supp. 10, 17–18 (S.D. Iowa 1975), *aff'd on other grounds,* 545 F.2d 1137 (8th Cir. 1976). Nevertheless, where there is parental conduct which is clearly detrimental to a child's welfare, there is no need for more explicit statutory language "to 'spell out' how poorly [parents] can treat their child before risking loss of their parental rights." *State v. McMaster,* 259 Or. 291, 299, 486 P.2d 567, 571 (1971). Courts are reluctant to strike down statutes on the ground of vagueness where the statute "by [its] terms or as authoritatively construed [applies] without question" to those litigants before the court. *Parker v. Levy,* 417 U.S. 733, 755–56 (1974) (citation omitted).

■■ Significantly, RSA 170-C:5, IV (Supp. 1981) provides for the termination of parental rights, not because of particular parental conduct, but because of a parent's condition, *i.e.,* mental illness or mental deficiency. In the case at hand, expert testimony in regard to the existence of the condition of "mental illness" in both parents was offered by Dr. Dixon and by Dr. George A. Hilton, both of whom are State-licensed psychiatrists. However, the critical issue, whether such mental illness renders the parents incapable of giving proper parental care and protection for a longer period of time than would be wise or prudent, is a question for the court to determine. *In re Fay G.,* 120 N.H. at 156, 412 A.2d at 1015; *see* RSA 170-C:5, IV (Supp. 1981). Consequently, the testimony of Daniel Williams, a licensed psychologist, concerning the needs of the children was supportive of the State's petition, but not conclusive on the issue of whether the "mental illness" of each parent required termination of their parental rights with respect to each child, which was ultimately a finding made by the master. *See State v. Rullo,* 120 N.H. 149, 152, 412 A.2d 1009, 1011–12 (1980).

■ A review of the record supports the master's finding that John Doe suffers from a mental illness that manifests itself in conduct that is clearly detrimental to the best interests of the children. We do not believe that one who has physically abused a young child can argue that a child-protection statute which provides for the termination of parental rights on grounds of mental illness does not implicitly encompass mental illnesses which manifest themselves in abusive or violent conduct. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy,* 471 U.S. at 756. Moreover, Dr. Hilton predicted that Mr. Doe's hostile and impulsively angry aggressive behavior would recur, which would be detrimental to both children. Accordingly,

we affirm the probate court decree terminating John Doe's parental rights with respect to both Sally and Joe Doe.

However, we find that both the law and the record are vague in regard to the order terminating Jane Doe's parental rights. Significantly, the master erroneously made a finding, which he later amended, that Jane Doe suffered from a schizoid disorder. No expert rendered an opinion that Jane Doe suffered from a schizoid disorder, but Dr. Hilton did diagnose John Doe as suffering from such a disorder. Although the master acknowledged this discrepancy, the decree was never amended to reflect this error. Moreover, Dr. Dixon's testimony regarding Jane Doe states that she is "love starved" and diagnosed her as having a "borderline personality." Dr. Hilton described Jane Doe as suffering from a personality disorder with "dependent features" which manifests itself in "passivity, subordination of her own needs to others and lack of self-confidence" as well as "anger and resentment at having to give to her children."

 To survive a challenge on the ground of vagueness, a statute must not only give fair notice of what conduct is prohibited, but also provide an ascertainable standard by which it is applied to proscribe conduct. *See State v. Albers*, 113 N.H. at 133–34, 303 A.2d at 199. With regard to Jane Doe, we do not find that RSA 170-C:5, IV (Supp. 1981) meets this test. Many parents may exhibit the same personality traits as does Jane Doe, but not all triers of fact would agree beyond a reasonable doubt that such traits result in conduct which requires such a drastic measure as termination of parental rights. Today we hold that to support such an extreme and irreversible action as a termination of parental rights pursuant to RSA 170-C:5, IV (Supp. 1981), where there is no evidence of mental illness as manifested by child abuse by the parent, the probate court must make explicit findings beyond a reasonable doubt, supported by the record, as to the detrimental effect of the parent's mental illness on the child, so as to require termination of parental rights. Therefore, we remand for a consideration of such findings as to Jane Doe, in accordance with this opinion.

 We also note that termination of one spouse's parental rights does not require termination of the rights of the other. *See In re Irene W.*, 121 N.H. at 125, 427 A.2d at 26. Because of the fundamental liberty interest threatened whenever the State seeks to sever parent-child relationships permanently, we will not sanction imputing one parent's conduct to terminate the other parent's rights, merely because of the marital relationship. Before both parents'

rights can be terminated based on the conduct of only one parent, the record must show that no other arrangement is feasible, such as supervised visitation by the parent for whom the record does not independently support termination until such time as that parent can ensure that the home is safe for the children.

John and Jane Doe also challenge the admission and consideration of Dr. Dixon's testimony on the ground that she has been their psychiatrist and that, pursuant to RSA 329:26, information obtained through a physician-patient relationship is privileged. The record indicates that Mr. and Mrs. Doe executed releases so that Dr. Dixon would provide a confidential report to the division of welfare in connection with this case. *See State v. Thresher*, 122 N.H. 63, 72, 442 A.2d 578, 582 (1982). It is this report which the State introduced, and the record also shows that Dr. Dixon's testimony was confined to matters within that report. Accordingly, we hold that no statutory privilege was violated.

*Affirmed in part; reversed in part; remanded.*

All concurred.