Hillsborough County Probate Court
No. 2000-386

# IN RE ANTONIO W. AND DANIEL M.

Argued: November 7, 2001
Opinion Issued: February 5, 2002

*Harkaway Law Office*, of Nashua (*Barry I. Harkaway* on the brief and orally), for Cristal S.

*Philip T. McLaughlin*, attorney general (*Laura E. B. Lombardi*, attorney, on the brief and orally), for the State.

BRODERICK, J. The Hillsborough County Probate Court (*Cloutier*, J.) granted the petition of the State Division for Children, Youth, and Families (DCYF) to terminate the parental rights of Cristal S. over her sons, Antonio W. and Daniel M., pursuant to RSA chapter 170-C (1994 & Supp. 2001). We affirm.

The record supports the following facts. Daniel was born in November 1990. In April 1993, DCYF filed a petition in the Nashua District Court charging Cristal S. with neglect. Under the terms of a consent order, Daniel remained in the custody of his mother, DCYF was granted legal custody and Cristal was obliged to participate in various services offered by DCYF. The case was closed in January 1995 and Daniel was returned to the legal custody of his mother.

Between April 1994 and May 1996, DCYF received twelve reports concerning Daniel, alleging physical abuse or neglect by Cristal and sexual abuse by two male acquaintances of Cristal. Based upon these reports, DCYF made an unannounced home visit on May 28, 1996, and found that Cristal had placed Daniel with his paternal grandparents because he was "out of control." The DCYF worker noted that the home was dirty and that Cristal had carved her son's initials in her arm with a safety pin, drawing blood, to prove her love for him. Cristal admitted that she was "out of control" and threatened to kill herself if DCYF took Daniel. DCYF met with Daniel's paternal grandmother, who acknowledged that because of her illness she could not care for him.

In May 1996, DCYF filed another petition for neglect in the Nashua District Court. In its *ex parte* order, the court made a preliminary finding that Daniel was in imminent danger and promptly placed him in the

protective custody of DCYF. Following an adjudicatory hearing, the court found Daniel was neglected within the meaning of RSA 169-C:3, XIX(c) (1994), and awarded legal custody to DCYF. Cristal was ordered to participate in a partial inpatient hospitalization program, to follow its recommendations and to secure and maintain suitable housing in order for Daniel to be returned to her care. Daniel was placed at St. Charles Home, and Cristal was allowed weekly supervised visitation.

While at St. Charles, Daniel exhibited sexualized behavior not typical of children his age and extreme even when compared to other children at St. Charles who had been sexually abused. This behavior intensified during and after visits by his mother. In response, St. Charles created a visitation treatment plan for Cristal and constantly redirected her behavior during visits. In August 1998, Daniel told his therapist that his mother had touched his "private parts." After visits with Cristal were reduced, Daniel disclosed more about inappropriate sexual contact with his mother and her boyfriends. Although we do not relate in graphic detail the disclosed conduct, it was profoundly disturbing.

Antonio was born in September 1996. In October 1996, DCYF received a call from a physician at Nashua Pediatrics who was concerned because Cristal refused to admit Antonio to the hospital, against the physician's advice, for failure to thrive. A DCYF child protective worker visited Cristal and persuaded her to take Antonio to the hospital. In November 1996, DCYF received a report from a physician that Cristal had not bonded with her son and that she lacked the competence to care for him. DCYF also learned that Antonio had been left with an inappropriate caregiver who was involved in a domestic altercation while holding him, causing the infant's admission to a hospital emergency room. A DCYF social worker also reported that Cristal's home environment was a "disaster."

In early December, DCYF received a further report that Cristal had left Antonio with a friend, saying that she could no longer care for him, and attempted suicide. DCYF filed a petition for neglect in the Nashua District Court and was awarded temporary custody of the child.

During an adjudicatory hearing in January 1997, Cristal consented to a finding of neglect. The district court found that Antonio had a history of failure to thrive, that Cristal had been diagnosed with borderline personality disorder and that she needed intensive support services to care for Antonio. The court awarded legal custody to DCYF and ordered Cristal to attend therapy and to make appropriate living arrangements. Antonio remained in foster care, and Cristal was granted visitation rights provided no unrelated males accompanied her.

Between November 1996 and February 1999, the district court held periodic review hearings to monitor Cristal's compliance with its orders regarding both of her sons. On almost every occasion she was found not to be in compliance. At one hearing, although she was found to be in compliance, the court noted its concerns about inappropriate touching of Daniel and the presence of unrelated males during visits with Antonio. These specific violations were of ongoing concern, as were her failures to maintain a safe and clean home and regularly attend therapy.

In January and April 1999, DCYF petitioned to terminate Cristal's parental rights to Antonio and Daniel, respectively, pursuant to RSA 170-C:5, III, alleging that she had failed to correct the conditions of neglect. Further review hearings were held in February, June and September. The court found that Cristal was not in full compliance with its orders, citing her erratic attendance at counseling and her inability to maintain a clean and safe apartment.

At the six-day termination hearing in February and March 2000, DCYF child protective service workers testified to Cristal's noncompliance with court orders. Parent aides and social workers testified to their ongoing efforts to work with Cristal so she could maintain a clean and safe home and address the issue of unrelated males being present during Antonio's visits. Cristal's therapist testified that she suffered from borderline personality disorder which required long-term, consistent therapy, without which she would be unable to become an appropriate caregiver for her children. The therapist also testified that Cristal's attendance at counseling had been irregular. Daniel's therapist testified that, in her opinion, "Cristal would not be able to provide a safe, caring, nurturing environment for any child." She described the interaction between Cristal and Daniel as "primitive" and "animalistic," stating that this was "one of the most extreme cases [she had] ever seen of lack of boundaries and sexualized behavior between a mother and a child." In addition, Daniel's psychologist testified to the child's revelations of sexual encounters with his mother. The court allowed this testimony solely upon Cristal's failure to correct conditions of neglect and on its determination of the best interests of the child. The psychologist also testified that Daniel's anxiety level decreased after visits with Cristal were terminated, and, in his opinion, returning Daniel to his mother's care "would be very damaging [and] destructive." The administrator of St. Charles Home testified that Cristal allowed Daniel to touch her in sexually inappropriate ways during visits. DCYF provided the court with a social study that it had conducted pursuant to RSA 170-C:9.

At the conclusion of the hearing, with respect to both children, the probate court ruled that Cristal had failed to correct the conditions which

led to the original findings of neglect and that it was in the children's best interests to terminate her parental rights. Specifically, it found that Cristal had failed to maintain an appropriate and safe home, attend weekly counseling with her therapist, sever contact with inappropriate male friends during visits with her children and take direction from the St. Charles staff regarding appropriate contact with Daniel. Cristal's motion for reconsideration was denied.

On appeal, Cristal raises a number of questions challenging the constitutionality, under the State Constitution, of the neglect and termination proceedings as to both children. Because Cristal failed to challenge the original neglect petitions and proceedings in the district court, these arguments were waived. Additionally, she argues that the probate court erred in terminating her parental rights as to Antonio. Accordingly, we confine our constitutional analysis to her challenge to the termination proceedings under RSA chapter 170-C.

### I

 Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. *In re Taryn D.*, 141 N.H. 376, 378 (1996). Nevertheless, the fundamental rights of parents are not unassailable, and terminations will be upheld if applicable due process requirements have been met. *In re Doe*, 123 N.H. 634, 641 (1983). The dominant consideration in termination proceedings under RSA chapter 170-C is the welfare of the child, which must prevail over the interests of the parents. *Id.*

 Before a court may order the termination of a parent's rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. *In re Taryn D.*, 141 N.H. at 378; RSA 170-C:5. One such ground is failure to correct the conditions leading to a finding of neglect under RSA chapter 169-C. RSA 170-C:5, III. Once the probate court has found such proof, it must then consider whether termination is in the child's best interest. *In re Taryn D.*, 141 N.H. at 378. We will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. *In re William A.*, 142 N.H. 598, 600 (1998).

### II

We first address Cristal's contention that RSA 170-C:9 violates fundamental fairness by allowing the agency seeking termination, *i.e.*, DCYF, to provide a social study to the probate court, thereby exerting undue influence over the judge.

RSA 170-C:9, I, mandates the probate court to direct the department of health and human services or other authorized agency to conduct a social study describing "the circumstances of the petition, the social history, the present condition of the child and parents, proposed plans for the child, and such other facts as may be pertinent to the parent-child relationship. The purpose of the social study is to aid the court in making disposition of the petition and shall be considered by the court" before doing so.

██ Because the factual findings made by the probate court were amply supported by the evidence presented at the termination hearing, independent of the social study, any alleged error associated with its admission was harmless. *See In re Tracy M.*, 137 N.H. 119, 125-26 (1993). During the six-day hearing, the probate court heard testimony from child protective service workers, parent aides, therapists who had treated both Daniel and Cristal, and the administrator of St. Charles Home, all of whom testified to Cristal's failure to correct the conditions leading to the original neglect findings.

Cristal next argues that the probate court deprived her of the opportunity to confront her accusers and cross-examine witnesses by allowing the admission of certain hearsay testimony without compelling the State to produce two witnesses, a former parent aide and Cristal's therapist, to testify. We disagree. RSA 170-C:10 provides:

> [R]elevant and material information of any nature, including that contained in reports, studies or examinations, may be admitted and relied upon to the extent of its probative value. When information contained in a report, study or examination is admitted in evidence, the person making such a report, study or examination shall be subject to both direct and cross-examination *if he is residing or working within the state, or if he is otherwise reasonably available.*

(Emphasis added.)

██ Here, the probate court admitted into evidence written reports of a parent aide who did not testify at the hearing. The State represented that the parent aide resided in Massachusetts and was unavailable to testify. Accordingly, the record indicates that the probate court complied with the statutory requirements for admission of evidence under RSA 170-C:10. Recognizing that Cristal was disadvantaged by the inability to cross-examine the aide, however, the court indicated that it intended to give the reports very little weight. Moreover, even without the reports, the abundance of other evidence presented at the hearing clearly supports the

court's decision. Therefore, any alleged error in their admission was harmless. *See In re Tracy M.*, 137 N.H. at 125-26. With regard to the admission of hearsay statements made by Cristal's therapist, the record indicates that Cristal did not timely object to them and, accordingly, any objection is waived. *See State v. Guay*, 130 N.H. 413, 418-19 (1988).

Cristal next contends that she was denied due process notice of the grounds upon which the termination was based. Specifically, she argues that, because neither mental illness nor sexual abuse were alleged in the termination petition, evidence on these issues was improperly admitted. We disagree. The admissibility of evidence is committed to the sound discretion of the trial judge, and such a ruling will not be disturbed on appeal unless there has been an unsustainable exercise of discretion. *In re Brittany L.*, 144 N.H. 139, 144 (1999); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

■ The record shows that the terminations were not based upon the independent grounds of sexual abuse or mental illness. The probate court made it clear throughout the hearing that it was admitting evidence of sexual abuse only on the issues of failure to correct and the best interests of the children. The underlying neglect petition alleged that Daniel had been sexually abused by two different males while in the care of his mother. Thus, one condition of neglect that Cristal needed to correct was her ability to protect Daniel from such abuse. In addition, the sexualized behavior between Cristal and Daniel during visits and Cristal's inability to set boundaries with her son were major concerns throughout the reunification effort. Similarly, evidence relating to Cristal's mental health was admitted for the purpose of showing that she failed to correct the conditions of neglect, *i.e.*, to attend counseling to deal with her psychological issues.

Finally, Cristal argues that the probate court erred in terminating rights as to Antonio because it did so solely on factual grounds established for Daniel. We disagree. The original neglect order regarding Antonio explicitly ordered Cristal to attend counseling, to maintain appropriate living arrangements and to keep Antonio away from unrelated males. The evidence supports the probate court's finding that, despite the number of years that DCYF worked with her, Cristal failed to comply with these conditions.

We need not address Cristal's remaining arguments because they were either not properly raised below and preserved for appeal, or they are

meritless and warrant no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.