Hillsborough County Probate Court
No. 2008-900

## IN RE ADAM R.

Argued: September 23, 2009
Opinion Issued: March 10, 2010

*Smith-Weiss, Shepard & Durmer, P.C.*, of Nashua (*Robert M. Shepard* on the brief and orally), for the respondent.

*Law Offices of Randall E. Wilbert, PLLC*, of Nashua (*Lucinda Hopkins* on the brief and orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Naomi N. Butterfield*, assistant attorney general, on the brief), for the State of New Hampshire, as *amicus curiae*.

BRODERICK, C.J. The respondent, K.B., appeals the order of the Hillsborough County Probate Court (*O'Neill*, J.) granting the petition to terminate her parental rights over her son, Adam R. *See* RSA 170-C:5, IV (2002). We affirm.

## I

The record supports the following. Adam R. (Adam) was born to K.B. (mother) and A.R. (father) in November 2004. Adam's father has cognitive limitations, and his mother has significant cognitive limitations and emotional difficulties. She also is afflicted with a suspected severe language-based learning disability. Adam has been diagnosed with Pervasive Developmental Disorder, speech and language delays, muscle apraxia, a seizure disorder, and a form of autism. His many special needs require extensive medical care.

From shortly after his birth, Adam and his parents lived in Nashua with the petitioners, J.R. and F.R., his paternal grandparents (grandparents). When Adam was approximately three months old, his father moved out, leaving Adam and his mother with his grandparents. Since that time, the father has had little involvement in Adam's life, and consented to the termination of his parental rights and to Adam's adoption by the grandparents.

Concerned that the division for children, youth and families (DCYF) might intervene and place Adam in a foster home because of certain behavior between his parents, the grandparents petitioned the probate

court in late February 2005 for a temporary guardianship over their grandson. Specifically, they requested that the probate court grant them "temporary custody of [Adam] until [K.B.] is on med[ication]s and stable per a doctor[']s report." The Hillsborough County Probate Court (*Cloutier*, J.) granted the petition in April, and ruled that it would not terminate the guardianship until the mother underwent drug and alcohol evaluations and psychological counseling, took parenting and domestic violence courses, secured proper housing, and found employment. Further, the probate court ruled that visitation between Adam and his mother would be at the grandparents' discretion until the mother had taken positive steps to correct her problems for a minimum of six months. The mother did not appeal.

In October 2007, the grandparents petitioned for the termination of parental rights (TPR), alleging that the mother had abandoned Adam, failed to support, educate, or care for him, and that she suffered from a mental deficiency or mental illness. A guardian ad litem (GAL) was appointed to evaluate whether the mother had complied with the outstanding guardianship order. The same GAL was appointed in the termination case in November.

In October 2008, pursuant to RSA 170-C:5, IV, the probate court granted the petition, stating:

> [T]he court finds beyond a reasonable doubt . . . that because of mental deficiency[, the mother] is and will continue to be incapable of giving Adam . . . proper parental care and protection for a longer period of time than would be wise or prudent to leave the child in an unstable or impermanent environment. This is especially true based upon Adam's own developmental issues and needs.
>
> The court further finds beyond a reasonable doubt that it is in the best interest of the minor to grant this petition as the [grandparents] are desirous of adopting Adam which would provide him with a stable and permanent family and with parents who have proven that they can fully address[] Adam's special needs.
>
> As the court has found that the petitioners have satisfied their burden under RSA 170-C:5[,] IV, it will not address the other grounds alleged by the petitioners.

The probate court denied the mother's motion for stay and reconsideration. This appeal followed.

The mother argues that the probate court erred in terminating her parental rights because: (1) there was no evidence that her cognitive limitations, emotional difficulties, and language-based learning disability had any detrimental effect upon Adam; instead, both the witnesses and the probate court "merely speculated" that such harm would result; (2) one psychologist did not meet with her, neither doctor observed her with Adam, and neither doctor testified to their conclusions "beyond a reasonable doubt"; and (3) she never had a chance to parent Adam due to the grandparents' guardianship, had substantially complied with the guardianship order, had a relationship with Adam and a regular schedule of contact with him, and there was no evidence of present or future danger to Adam if the termination petition was denied.

## II

■■ Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. *In re Antonio W.*, 147 N.H. 408, 412 (2002). Nevertheless, the fundamental rights of parents are not unassailable, and terminations of parental rights will be upheld if applicable due process requirements have been met. *Id.* The dominant consideration in termination proceedings under RSA chapter 170-C (2002 & Supp. 2009) is the welfare of the child, which prevails over the interests of the parents. *Id.* Before a probate court may order the termination of parental rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. *Id.*; RSA 170-C:5. If a statutory ground is established, the probate court must then consider whether termination is in the child's best interest. *Antonio W.*, 147 N.H. at 412. The calculation of a child's best interest is not an evidentiary fact, however, and need not be established "beyond a reasonable doubt." *In re Shannon M.*, 146 N.H. 22, 28 (2001).

The probate court, as the trier of fact, is in the best position to assess and weigh the evidence before it. *In re Craig T.*, 144 N.H. 584, 585 (1999). It has the benefit of observing the parties and their witnesses. *Id.* The findings of fact of a probate court are final unless they are so plainly erroneous that they could not reasonably be made. RSA 567-A:4 (2007). We will not disturb a probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. *Antonio W.*, 147 N.H. at 412.

The posture of this private action and the circumstances presented, while not necessarily unique, differ significantly from those usually seen in a TPR case. Most often, termination actions are brought by DCYF after a finding of abuse or neglect under RSA chapter 169-C. Here, there has been no finding of abuse or neglect. Notwithstanding the grandparents' concern over possible DCYF intervention in this case, DCYF has not been involved.

The process for correcting conditions of abuse and neglect and reunification under RSA chapter 169-C is not at issue here. Instead, this case involves the termination of parental rights under RSA 170-C:5, IV, where, because of mental deficiency or mental illness, a parent is incapable of providing proper parental care and protection.

RSA 170-C:5, IV provides that a TPR petition may be granted where the probate court finds the following:

> Because of mental deficiency or mental illness, the parent is and will continue to be incapable of giving the child proper parental care and protection for a longer period of time than would be wise or prudent to leave the child in an unstable or impermanent environment. Mental deficiency or mental illness shall be established by the testimony of either 2 licensed psychiatrists or clinical psychologists or one of each acting together.

### III

We address each of the mother's arguments in turn.

### A

The mother first argues that the probate court erred because there was no evidence that her cognitive limitations, emotional difficulties, and language-based learning disability had any detrimental effect on Adam. She contends that both the witnesses and the probate court "merely speculated" that such harm would result. The factual findings in a TPR case, to which we owe deference, are critical to our review. *In re Doe*, 123 N.H. 634, 637 (1983). Consequently, we note the factual background of this case and the testimony leading to the probate court's decision. *See id.*

The probate court heard testimony from two clinical and forensic psychologists, Catherine Howe, Ph.D., and Eric G. Mart, Ph.D. Dr. Howe testified that she conducted an evaluation of the mother by reviewing her past cognitive testing, academic testing from 1997 to 2004, and multiple incident reports and descriptions of her interactions with the GAL and the Greater Nashua Visitation Center from 2004 to September 2008.

Among Dr. Howe's conclusions were that: (1) the mother had a total intelligence quotient (IQ) of approximately fifty, generally referred to as "moderately mentally retarded" or an "intellectual disability"; (2) the mother's cognitive, emotional, and social development had leveled off at that of an eight-year-old; (3) the mother's reactions, responses, general functioning, and logic were all at the level of an eight-year-old; (4) the mother's inability to follow the very specific, but simple, rules of the

visitation center, or to learn from her mistakes regarding those rules, called into question her ability to keep Adam safe, consequently placing him in an unsafe position; (5) the mother's inability "to place herself in [Adam's] shoes" and understand the priority of his needs over hers, especially given Adam's significant disabilities and diminished ability to provide feedback to a parental figure, was concerning; (6) the mother was unable to understand Adam's needs, and to learn from him in a non-verbal manner; (7) the mother could not complete even the first step of very basic level tests, and quickly became frustrated to a "fairly extreme" level; and (8) the mother's mental deficiency would prevent progress beyond that point. Dr. Howe opined that "[r]egardless of the etiology of symptoms, the [mother's] low frustration tolerance and high impulsivity [could] result in unsafe situations." She concluded her testimony by stating:

> When things get frustrating [the mother] has been known to act out, whether it's been to — when the child was an infant, to grab [him], take them away and lock herself in her room, whether things become frustrated and to have a suicidal gesture, claim they're going to jump out a window, or to just yell, to get angry, to be verbally frustrated.

> . . . .

> I can't predict what will happen, but . . . parenting is — can be very frustrating. And with somebody who's very easily frustrated, that may not be a great combination. I can't predict the future though.

Dr. Mart testified that he met with the mother and her caseworker; conducted a clinical interview, a mental status examination, and an intellectual screening test; and reviewed records concerning Adam's neurological and developmental status and his guardianship. He explained that the evaluation "had some problematic aspects to it," in part because the mother found it to be "very stressful," and because she "seem[ed] to have difficulty when she feels she's not doing well or she's being asked to do a task that's going to reveal problems that she has, [such as] processing information."

Among Dr. Mart's conclusions were that: (1) testing revealed the mother to have an IQ of eighty — "in the borderline to low average range[, b]ut that's misleading because her verbal score is much lower than her performance score[, s]o her ability to solve problems utilizing language is problematic compared to her relatively intact ability to notice visual problems or to think non-verbally"; (2) it is much more likely that the mother has a "very severe language-based learning disability than retar-

dation, per se"; (3) he was not able to do other tests because the mother did not want to do them and became frustrated and increasingly upset; (4) he suspected that the mother's ready frustration could be related to "executive functioning deficits" in that part of the brain "that allows . . . planning, certain types of comprehension, [and] emotional regulation"; and (5) the mother "has difficulty modulating her emotions, controlling them, and dealing with frustration."

Mental deficiency, for purposes of termination of parental rights, must be proved by the testimony of two psychiatrists or psychologists. *See In re Kristopher B.*, 125 N.H. 678, 684 (1984). To the extent the mother argues that the probate court's finding of mental deficiency was error, we disagree. The testimony of Drs. Howe and Mart provided ample evidence of the mother's mental deficiency, and we cannot say that the probate court's findings to support mental deficiency were so plainly erroneous that they could not be reasonably made. *See* RSA 567-A:4.

The essence of the mother's argument, however, is clear. Citing *State v. Robert H.*, 118 N.H. 713, 718 (1978), *overruled in part on other grounds by In re Craig T.*, 147 N.H. 739, 744-45 (2002), *In re Doe*, 123 N.H. at 643, and *In re Kristopher B.*, 125 N.H. at 684-85, she contends that the probate court erred, stating: "[M]erely having the condition of mental deficienc[y] is an insufficient basis to terminate her parental rights without evidence of a link between those deficiencies and some specific harm to Adam. . . . As neither the termination order nor the conclusions by the witness[es] contain explicit findings, beyond a reasonable doubt, that [her] manifestations had any detrimental effect upon her son," the probate court's decision should be reversed. We disagree.

In *Robert H.*, we announced that the State was required to prove its case under RSA chapter 170-C beyond a reasonable doubt before the termination of parental rights could be ordered. *See Robert H.*, 118 N.H. at 716. Within the context of RSA 170-C:5, III (termination of parental rights on the grounds of a failure to correct the conditions leading to a finding of neglect), we further held that:

> In an ideal world, children would not be brought up in inadequate homes. But this is not an ideal world, and to hold merely that inadequate parenting, absent specific harm to the children, is sufficient to terminate parental rights in the best interest of the child is too vague a concept and places undue emphasis on the parental conduct rather than on any harm to the child.

*Id.* at 718 (quotations and citation omitted).

■ In *In re Doe*, decided pursuant to RSA 170-C:5, IV, we recognized that the statute provides for the termination of parental rights, *"not* because of particular parental conduct, but because of a parent's condition, *i.e.*, mental illness or mental deficiency." *Doe*, 123 N.H. at 642 (emphasis added). Further, we held:

> [T]hat to support such an extreme and irreversible action as a termination of parental rights pursuant to [the statute], where there is no evidence of mental illness as manifested by child abuse by the parent, the probate court must make explicit findings beyond a reasonable doubt, supported by the record, as to the detrimental effect of the parent's mental illness on the child, so as to require termination of parental rights.

*Id.* at 643.

*In re Kristopher B.* involved the termination of a mother's parental rights, pursuant to RSA 170-C:5, IV, in response to a petition filed by the division of welfare. The mother had been admitted to the New Hampshire Hospital when her son was approximately eighteen months old. Since the age of thirteen months, her son had been living in a foster home with a couple who expressed a desire to adopt him. *Kristopher B.*, 125 N.H. at 680. The testimony of two psychologists, based upon their own observations of the mother, established that she was mentally ill and unable to care for her son. The mother testified that she was not presently capable, nor did she know when she might be capable, of caring for him. Both psychologists testified that it "could be two years or longer before the [mother] would be capable of being a parent to [her son]." *Id.* at 684. At the time of the TPR hearing, the child had been in the care of the same foster family for three years, and we noted that "psychological bonding" to foster parents occurs within that time frame. *Id.* at 684-85. On appeal, the mother argued, among other things, that the probate court had erred because the division of welfare had failed to prove that her continued parental relationship with her son would cause him "specific harm." *Id.* at 685. Affirming the decision of the probate court, we stated:

> While we agree with the defendant's argument that the detrimental effect on a child of a parent's mental illness must be proven in order to terminate parental rights under RSA 170-C:5, IV . . . , we note that many different factual settings may provide such proof. In the present case, the detrimental effect of the [mother's] mental illness on the child was clearly indicated by her own testimony as well as by the testimony of two psychologists. The specific harm to the child in this case was caused by the [mother's]

continued inability to live outside of a mental [health] institution or to provide any care for her son for the foreseeable future.

The [probate] master made a finding that the [mother] was incapable of giving her son proper parental care, but he did not explicitly state the detrimental effect upon [the son] of the [mother's] incapabilities. Under the standard established in [*In re Doe*, 123 N.H. 634 (1983)], the [probate] master's failure to make explicit findings of specific harm to the child would require a remand for additional findings. We hold, however, that the evidence in this case would compel any rational fact-finder to find specific harm to the child caused by the [mother's] mental illness. Therefore, it is not necessary to remand for explicit findings of detriment to [the son] in this case.

*Id.* at 685-86.

█ In the present case, as in *Kristopher B.*, the body of the probate court order terminating the mother's parental rights over Adam does not contain the requisite explicit findings concerning the detrimental effect on, or the specific harm to, Adam from her mental deficiency. However, the order does recite that "[t]he parties' requested findings of fact and rulings of law are granted or denied consistent with the above order." The mother has failed to include the parties' requested findings of fact and rulings of law in the record. The appealing party has the burden of presenting a record sufficient to allow the court to decide the issues on appeal. *In re Jonathan T.*, 148 N.H. 296, 300 (2002); *see also* SUP. CT. R. 13. In the absence of that portion of the record, we cannot say that the probate court failed to make the requisite explicit findings.

█ Moreover, even if we were to assume that the requisite explicit findings were not made, we believe that the evidence in this case, as in *Kristopher B.*, would compel any rational fact-finder to find a detrimental effect on, or specific harm to, the child caused by the mother's mental deficiency — that is, an inability to provide proper parental care for Adam now or for the foreseeable future. *See Kristopher B.*, 125 N.H. at 685.

That evidence included the previously noted testimony of Drs. Howe and Mart, as well as testimony from the grandparents, the GAL, the mother, and Adam's educational advocate/resource specialist. In summarizing the testimony of Dr. Howe, the probate court noted that she was of the opinion that the mother would respond to difficult social situations with the level of maturity of an eight-year-old, and that this "theoretical assumption is supported by descriptions of [the mother] in the community where under stress, she has been impulsive, argumentative, deceptive, illogical, and has

created dangerous situations," and that "as a result of this intellectual disability, [the mother] would place [Adam] in an unsafe position and could not follow fairly simple safety rules."

The probate court also summarized the testimony of Dr. Mart, and noted:

> [Dr. Mart] further opined that based on the information at his disposal it is difficult to see how [the mother] would be able to be the primary physical custodian of her son anytime in the foreseeable future. Dr. Mart further stated in his report that it has been difficult for [the mother] to deal with her own needs and that Adam, due to his developmental disabilities, is the type of child who will present ongoing challenges to his caregivers for an extended period of time. Dr. Mart stated that based on the fact that Adam apparently requires a very high level of supervision and intervention, it is difficult to see how [the mother] could deal with these problems and advocate for her son when she has similar problems of her own. Dr. Mart concludes that it is his opinion that [the mother] will not be able to appropriately care for her son even if reasonable supports are put in place.

In her report and testimony, the GAL noted that the mother was hospitalized in January 2006 after she attempted suicide by overdosing on prescription medicine and attempting to throw herself off a third story balcony. The father reported to the police that the mother had also threatened to kill herself with a knife. The GAL also noted a second suicide attempt in September 2006 when the mother again tried to jump from a third story balcony; the mother subsequently tested positive for marijuana at the hospital and was diagnosed with depression. During the GAL's home visit with the mother in her third-story apartment, the mother showed the GAL a back porch area, which was enclosed by a three-foot high half-wall. The GAL reported that the mother, when asked, did not understand the necessity of protecting Adam from climbing over it.

Subsequent to assessing and weighing the evidence before it, the probate court made the following factual findings:

> On the day the [grandparents'] guardianship [petition] was granted, [the mother] locked herself in her room at the guardians' home with [Adam] and the guardians had to obtain their guardianship paperwork and the assistance of the police the next day to remove [Adam] from the locked room. [The mother] then moved out of the guardians' home and called in a threat to the guardians while the police were present. The guardians then obtained a restraining order against [the mother] at the recommendation of the police.

The guardians then set up supervised visitation between [the mother] and [Adam] at the visitation center. [The mother] was fairly consistent with the visitations at the visitation center although there are two blocks of time where [she] missed 6 months of visitation and 4 months of visitation due to suspension of the visitation when she didn't abide by the rules. However [the mother] was substantially in compliance with the rules of the visitation center and most of the visits were without incident. The problem is that [the mother] never could progress in the four-step process of the visitation center that would lead to unsupervised visitation. This was due to her failure to make progress during the supervised visits.

Based upon our review of the record, we believe that the detrimental effect of the mother's mental deficiency on the child is clearly demonstrated, as a matter of law, by the testimony and various reports of the two psychologists, the grandparents, and the GAL. The detrimental effect, or specific harm to Adam, is caused by the mother's inability, as a result of her mental deficiency, to properly care for him now or in the foreseeable future. *See Kristopher B.*, 125 N.H. at 685.

B

The mother next contends that the probate court erred in terminating her parental rights because one of the psychologists did not meet with her, neither doctor observed her with Adam, and "neither doctor testified to their conclusions beyond a reasonable doubt, nor did any doctor provide explicit findings of fact to support their position." We disagree.

■ Dr. Mart did meet with the mother and her caseworker. Dr. Howe testified that she found a meeting place and time that was acceptable, at least to the mother's caseworker, but that the mother ultimately did not attend. RSA 170-C:5, IV does not require the clinical psychologists to meet either personally with the mother or together with the mother and child. The mother cites no authority, and we know of none, requiring such meetings or direct observations. Further, we do not believe that the absence of an interview with the mother renders Dr. Howe's review of all of the mother's past cognitive testing, academic testing, and multiple incident reports and descriptions of her interactions with the GAL and the Greater Nashua Visitation Center inadequate for the purposes of either forming an opinion or testifying about the mother's mental deficiency and cognitive limitations. *See generally id.* at 682 ("The legislature has relied upon the professional opinion of psychiatrists or psychologists to prove mental illness for termination of parental rights under [RSA 170-C:5, IV].");

*Appeal of Kelly*, 158 N.H. 484, 491 (2009) (American Psychological Association Code of Conduct ("Bases for [Psychological] Assessments") provides, in certain circumstances, for psychological opinions in the absence of individual examination or based on record review).

█ Further, the mother's argument that the probate court erred because none of the witnesses made "explicit findings, beyond a reasonable doubt," regarding detrimental effect or their conclusions, is misplaced. The responsibility for making explicit factual findings beyond a reasonable doubt falls squarely on the trier of fact, here the probate court, and not on any individual witness. As previously noted, in TPR cases where there is no evidence of a parent's mental illness as manifested by child abuse, it is the probate court that "must make explicit findings beyond a reasonable doubt, supported by the record, as to the detrimental effect of the parent's mental illness on the child." *Doe*, 123 N.H. at 643. Ultimately, "the critical issue, whether such mental illness renders the parents incapable of giving proper parental care and protection for a longer period of time than would be wise or prudent, *is a question for the court to determine.*" *Id.* at 642 (emphasis added).

## C

The mother next argues that the probate court erred in terminating her parental rights because she never had a chance to parent Adam due to his grandparents' guardianship, she had substantially complied with the guardianship order, she had a relationship with Adam and a regular schedule of contact with him, and there was no evidence of present or future danger to her son if the termination petition was denied. We read her argument to be, in essence, that the termination of her parental rights was premature, as she should have been afforded the opportunity to establish that she would not fail as Adam's parent.

█ The decision whether or not to afford the mother such an opportunity implicates the necessary weighing of her fundamental rights as a parent against the best interest of Adam. *See Kristopher B.*, 125 N.H. at 685. As noted earlier, however, the dominant consideration in that process is the welfare of the child, which must prevail over the interests of the parent. *See Antonio W.*, 147 N.H. at 412. The determination of what is in a child's best interest is not an evidentiary fact, and is not required to be established "beyond a reasonable doubt." *Shannon M.*, 146 N.H. at 28.

█ We have already concluded that the evidence in this case would compel any rational fact-finder to find a detrimental effect on, or specific harm to, Adam caused by his mother's mental deficiency — that is, an inability to provide proper parental care for Adam now or for the

foreseeable future. While we recognize that the probate court cannot predict with absolute certainty what the mother's capabilities may be, we believe that the record amply supports a conclusion that the mother's parenting abilities will remain incurably deficient for a longer period of time than would be wise or prudent to leave the child in an unstable or impermanent environment. *See, e.g., In re Juvenile 2006-674*, 156 N.H. 1, 7-8 (2007). Consequently, we believe that the probate court was correct in its weighing of the mother's fundamental rights as a parent and the best interest of Adam.

This is not a case, as argued by the mother, where she has been deprived of her right to parent Adam simply because "better parents" have been found. *See In re Angel N.*, 141 N.H. 158, 165 (1996) (Johnson, J. dissenting). Instead, we believe that the probate court's decision properly recognized that keeping Adam in a stable and permanent environment was consistent with his best interest. *See In re William A.*, 142 N.H. 598, 601 (1998). Adam has been in the care of his grandparents (and legal guardians) since he was five months old, and has no doubt benefited from the "psychological bonding" that occurs between a child and foster parents, and the surroundings they provide, after two to three years in their care. *Kristopher B.*, 125 N.H. at 684; *see Lisa H.*, 134 N.H. at 193. The testimony of the grandparents, the GAL, and Adam's educational advocate/resource specialist, clearly supports findings that the grandparents are desirous of adopting Adam, and that they have been "intimately and consistently present in his life and know how to get him the best educational, physical and social services available." For example, the educational advocate testified that the grandmother's knowledge of sign language, and her ability to teach it to Adam, as well as her paraprofessional experience working with children with autism, have been instrumental in much of the progress that Adam has been able to make.

Further, we disagree with the mother that the probate court's order should be reversed based upon *William A. William A.* involved a father's petition to terminate the mother's (Jennifer) parental rights over their son (William) on the grounds of abandonment and nonsupport, and not mental deficiency. William was in the legal custody of his father and his father's wife, Lyne, the child's stepmother. The GAL recommended against terminating Jennifer's parental rights, and she had conditionally agreed to Lyne's appointment as William's legal guardian. The probate court found that Jennifer had abandoned William. The probate court further determined that it was in his best interest to terminate her parental rights. *William A.*, 142 N.H. at 600. We reversed, holding that the probate court had erred in the determination of William's best interest. Specifically, we held that there was no evidence to support that William could not be kept

in a stable environment unless his mother's parental rights were terminated. William was in the legal and physical custody of his father, and, absent further court order, William would remain at home with his father and stepmother. *Id.* at 601. Further, the record did not reflect any effort by Jennifer to reacquire legal or physical custody of her son. She merely wanted the right to visit him, and both the GAL and the stepmother believed that such visitation was in William's best interest. *Id.*

Here, however, Adam is not, and has not been, in the legal or physical custody of either parent since he was five months old. More important, the record reflects that the mother contested the grandparents' guardianship over Adam from the outset, as she "wanted to be able to take care of [her] own kid [and] didn't want anybody to step in." She testified that her goals remain "[f]or [Adam] to eventually come home and me to be able to take care of him and do everything for him that . . . needs to be done," and that the most important thing for her was "[f]or [Adam] to be with [her]." Finally, she affirmed that if the probate court denied the petition to terminate her parental rights and the guardianship remained in place, she would continue "to go to court and try to get [Adam] back." Consequently, Adam's relationship with his grandparents would remain at risk if the mother's parental rights were not terminated. *Cf. id.* at 602. Given the evidence presented in this case, we cannot agree that the continued ability of the mother to contest the grandparents' guardianship over Adam would be beneficial in maintaining a stable and secure environment for him.

The termination of a parent's legal bond to a child is a solemn and irreversible event. *Id.* From the evidence presented in this case, we have no doubt that the mother truly loves her son, and is sincere in her desire to try to maintain her parental relationship with him and to be his caregiver. However, on the record before us, the probate court's ruling that the mother, because of her mental deficiency, does not possess, and will not possess, the necessary capabilities to provide proper parental care and protection for Adam for a longer period of time than would be wise or prudent to leave him in an unstable or impermanent environment, is amply supported. Based upon the evidence presented, we believe that to give the mother the opportunity to fail would not be in Adam's best interest; consequently, we cannot say that the probate court's decree is either unsupported by the evidence or plainly erroneous as a matter of law.

*Affirmed.*

DALIANIS, DUGGAN, HICKS and CONBOY, JJ., concurred.