Claremont Family Division
No. 2008-785

IN RE ZACHARY G. & a.

Submitted: May 14, 2009
Opinion Issued: July 31, 2009

*Kelly A. Ayotte*, attorney general (*Suzan M. Lehmann*, senior assistant attorney general, on the memorandum of law), for the State.

*Elliott, Jasper, Auten, Shklar & Wellman-Ally, LLP*, of Newport (*Bruce R. Jasper* on the brief), for the mother.

HICKS, J. The mother, S.G., appeals an order of the Claremont Family Division (*Scheffy*, J.) terminating her parental rights. *See* RSA 170-C:5, III (2002). We affirm.

The record supports the following. S.G. is the natural mother of two minor children: Zachary G. and Kandace G. The New Hampshire Division for Children, Youth and Families (DCYF) filed petitions in March 2004 (the 2004 petitions) alleging that Zachary was abused and that Zachary and Kandace were neglected. *See* RSA 169-C:3, II(d), XIX (2002). Among other things, the petitions alleged repeated physical abuse of Zachary by A.G. (Zachary's father and S.G.'s husband) and S.G.'s failure to protect Zachary and Kandace from A.G.'s violent behavior.

The Claremont District Court approved a consent order in May 2004, entered findings of abuse and neglect, granted DCYF legal supervision of the children, prohibited visitation with the father, and required S.G. to undergo psychological and parenting evaluations. The court issued a dispositional order in June 2004 allowing the children to remain in S.G.'s

custody under DCYF supervision. The court ordered S.G. to "maintain a safe and sanitary home" and A.G. to "undergo a batterers evaluation."

After a review hearing in September 2004, the court commended S.G. for "keeping her home safe and clean" and being "receptive [to suggested] parenting strategies." It noted, however, that S.G. "has shown that she is unable to keep potentially harmful men out of her life." The court ordered out-of-home foster care placement for the children and required S.G. to undergo further parental counseling.

The court held another review hearing in December 2004 and found that, although S.G. demonstrated continuing commitment to maintaining the home and developing as a parent, she continued "having difficult[y] . . . keeping inappropriate men out of her home" and refused "to accept any responsibility for the children being removed from her care." It further noted that A.G. had been on S.G.'s "property at least 5 times despite a protective order instructing him to stay away from the residence." The court ordered S.G. to continue counseling. The court made similar findings and rulings following a March 2005 review hearing.

Over the following months, counselors and professionals working with S.G. made several observations calling into doubt her ability to keep abusive men out of her children's lives. In a June 2005 addendum to an earlier assessment report, Familystrength counselor Phyllis Ranta noted that S.G. remained hesitant to admit that A.G. abused Zachary, even when confronted with photographs of Zachary's bruises. Ranta further noted that S.G.'s "current belief that she now truly understands why [A.G.] should not see the children is to be viewed cautiously" in view of her past "cycle of understanding" that inevitably lapses "back to her initial thinking pattern."

A September 2005 report from the guardian ad litem (GAL) indicated that S.G. "did not feel that it should be her responsibility to keep the children away from their father." The GAL also found "it . . . highly probable that if the children are returned to [S.G.] she will allow contact between them and [A.G.]." She therefore recommended terminating the parental rights of both parents. As a result, DCYF urged termination of parental rights and adoption as the permanent plan at a September 2005 permanency hearing. The court, however, rejected this plan in October 2005. It ordered DCYF to begin gradual reunification. The court later granted DCYF's motion to close the action.

In October 2006, DCYF filed new petitions for abuse and neglect (the 2006 petitions) against A.G. and S.G. alleging that from June through October 2006, A.G. abused Zachary in S.G.'s home. In January 2007, the Claremont Family Division issued orders of protection after it found that A.G. abused Zachary and that S.G. neglected both children. Specifically, it

found that A.G. resided with the children in S.G.'s home in contravention of previous orders, that A.G. slapped Zachary while in the home and that S.G. knowingly allowed A.G. in the home without taking necessary precautions to ensure Zachary's safety. The children were placed with a relative. After a February 2007 dispositional hearing, the family division ordered out-of-home foster care placement because of S.G.'s failure to correct the conditions leading to its findings of abuse and neglect.

DCYF petitioned the family division in May 2007 to terminate A.G.'s and S.G.'s parental rights. It referenced the 2004 and 2007 findings of neglect and cited as grounds for termination S.G.'s failure "to correct the conditions leading to the May . . . 2004 finding of neglect despite reasonable efforts under the supervision of the district court."

After a February 2008 permanency hearing, the family division ruled that both parents failed to correct the conditions leading to the findings of abuse and neglect. It found that twelve months had passed since the January 2007 finding of neglect against S.G. and that DCYF made reasonable efforts to reunify S.G. and her children. It relieved DCYF from making future efforts towards reunification. Finally, it ordered DCYF to petition for termination of parental rights. DCYF, however, appears not to have filed a petition for termination following the permanency hearing because its May 2007 petition was still pending.

Prior to the family division's termination hearing, S.G. moved *in limine* to exclude from the hearing any "attempt[] to show that [S.G.] has failed to correct the conditions leading to the May . . . 2004 finding of neglect" because implicit in closing the 2004 case "was that [S.G.] had met the goals and corrected the conditions that led to the finding of neglect." The court deferred ruling on the matter.

The five-day termination hearing commenced on February 29, 2008, and concluded on June 11, 2008. In its decision, the family division first noted that A.G.'s voluntary relinquishment of parental rights mooted DCYF's petitions relating to him. It then denied S.G.'s motion *in limine*. Considering all of the evidence concerning both actions, it ordered termination of S.G.'s parental rights.

On appeal, S.G. argues that the trial court erred by denying her motion *in limine*. S.G. further challenges the statutory grounds for termination and the sufficiency of evidence supporting the family division's decree.

## I. Estoppel

Before the court may involuntarily terminate parental rights, "the petitioning party must prove a statutory ground for termination," *In re Antonio W.*, 147 N.H. 408, 412 (2002), and the court "must consider

whether [termination] is in the child's best interest," *In re Matthew G.*, 124 N.H. 414, 416 (1983); *see* RSA 170-C:1 (2002). DCYF called several witnesses at the termination hearing to relate observations from the first abuse and neglect action. Some witnesses gave opinion testimony in view of evidence from both actions. S.G. contends that the family division erred by denying her motion *in limine* because collateral and judicial estoppel preclude reconsideration of any such evidence. We disagree.

## A. Collateral Estoppel

■■ "Spurred by considerations of judicial economy and a policy of certainty and finality in our legal system, the doctrine[] of . . . collateral estoppel [has] been established to avoid repetitive litigation so that at some point litigation over a particular controversy must come to an end." *Cook v. Sullivan*, 149 N.H. 774, 777 (2003) (quotation omitted). Thus, "[t]he doctrine . . . bars a party to a prior action . . . from relitigating any issue or fact actually litigated and determined in the prior action." *Id.* at 778 (quotation omitted). The burden of proving estoppel is on the party asserting it. *Appeal of Stanton*, 147 N.H. 724, 730 (2002). We will uphold the trial court's ruling unless unsupported by the evidence or legally erroneous. *Cardinal Dev. Corp. v. Town of Winchester Zoning Bd. of Adjustment*, 157 N.H. 710, 715 (2008).

> Three basic conditions must . . . be satisfied before collateral estoppel will arise: the issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared as a party in the first action . . . .

*Cook*, 149 N.H. at 778 (quotation omitted).

S.G. has satisfied her burden of demonstrating these three conditions. There is no dispute that DCYF appeared in the first action and that the relevant issue — whether S.G. corrected the conditions leading to the 2004 finding of neglect by no longer exposing the children to violent, abusive men — is germane to both actions. Although that issue was never resolved by an express finding, necessarily implied by the October 2005 order to reunify is a finding, on the merits in a now closed action, that the children "will not be endangered in the manner adjudicated on the initial petition, if returned home," RSA 169-C:23, II (2002) (listing prerequisites to reunification). *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment *j* at 261 (1982) (giving preclusive effect to an "issue . . . recognized by the parties as important and by the trier as necessary to the first judgment").

■ That S.G. has successfully demonstrated the three conditions of collateral estoppel does not end our inquiry. While we do not accept

DCYF's broad contention that collateral estoppel does not apply in termination of parental rights proceedings, on occasion we do relax preclusive doctrines, "even where issues are identical, [if the] potential adverse impact on the public interest . . . warrant[s] relitigation." *McNair v. McNair*, 151 N.H. 343, 353 (2004) (quotation omitted); *cf.* RESTATEMENT (SECOND) OF JUDGMENTS § 28(5) (permitting relitigation of issue where "[t]here is a clear and convincing need for a new determination . . . because of the potential adverse impact . . . on the . . . interests of persons not themselves parties in the initial action . . . .").

■ Given the overriding need to ensure that the children's best interests are properly protected, *see* RSA 170-C:1 (2002), and the fact that RSA chapter 170-C broadly admits all "relevant and material information . . . to the extent of its probative value," RSA 170-C:10 (2002), we hold that collateral estoppel is no bar to reconsidering evidence from an earlier action if there exist subsequent and recent incidents of abuse and neglect substantially similar to those in the earlier, closed action. *See In re Interest of V.B.*, 370 N.W.2d 119, 121-22 (Neb. 1985); *Matter of Newman*, 619 P.2d 901, 904-06 (Or. Ct. App. 1980), *review denied*, 290 Or. 449 (1981); RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment *c* at 253; *cf. Sheehy v. Sheehy*, 88 N.H. 223, 226 (1936) (recognizing that res judicata bars subsequent custody determinations absent material change in circumstances). Consequently, collateral estoppel did not preclude consideration of evidence concerning the earlier, closed action because, after its closure, the condition leading to the 2004 findings of neglect — exposure of the children to violent, abusive men — again manifested and resulted in new incidents of abuse and neglect.

### B. Judicial Estoppel

■ The family division did not unsustainably exercise its discretion by rejecting S.G.'s judicial estoppel argument. *See Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 848 (2005). The doctrine of judicial estoppel protects judicial integrity by "prevent[ing] a party from prevailing in one phase of a case using one argument and then relying upon a contradictory argument to prevail in another phase." *Pike v. Mullikin*, 158 N.H. 267, 270 (2009). We doubt whether DCYF could ever be judicially estopped by assertions in a child protective proceeding resulting in reunification if such reunification ultimately proves antithetical to the children's best interests. Even assuming judicial estoppel could somehow apply, S.G. failed to establish that, by initiating termination proceedings, DCYF took a position "clearly inconsistent," *id.* at 270, with its earlier motion to close the 2004 petitions given the intervening incidents of abuse and neglect.

## II. Construction and Application of RSA chapter 170-C

S.G. next contends that the family division misapplied RSA 170-C:5, III, the statutory grounds for termination relied upon in this action. She further argues that insufficient evidence supported the family division's findings that she failed to correct conditions leading to a finding of neglect and that termination was in the children's best interests.

### A. Grounds for Termination

We begin by addressing S.G.'s arguments concerning RSA 170-C:5, III. The elements of RSA 170-C:5, III must be proven "beyond a reasonable doubt." *State v. Robert H.*, 118 N.H. 713, 716 (1978), *overruled in part on other grounds by In re Craig T.*, 147 N.H. 739, 744-45 (2002). We will not disturb the family division's finding unless it is unsupported by the evidence or plainly erroneous as a matter of law. *Antonio W.*, 147 N.H. at 412.

> This court is the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. In interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. We do not consider legislative history to construe a statute that is clear on its face.

*State v. Balukas*, 155 N.H. 377, 378-79 (2007) (citations omitted). RSA 170-C:5, III provides for termination where "[t]he parents, subsequent to a finding of child neglect or abuse under RSA 169-C, have failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the district court to rectify the conditions." Thus, in order to rely upon RSA 170-C:5, III as grounds for termination, DCYF must demonstrate: (1) a finding of child neglect or abuse under RSA chapter 169-C; (2) a failure to correct the same within twelve months of the finding; and (3) reasonable efforts to correct the condition provided under the direction of the court. *See id.*

DCYF specified S.G.'s failure to correct the conditions leading to the *2004* findings as grounds for termination, and the family division terminated S.G.'s parental rights based upon this allegation. We agree that this was error. RSA 170-C:5, III clearly imports the procedural safeguards and substantive requirements of RSA chapter 169-C. Relying exclusively upon the 2004 findings under RSA 170-C:5, III is tantamount to bypassing RSA chapter 169-C in the termination action by premising the termination petition upon stale RSA chapter 169-C findings of neglect.

■ While DCYF's allegation improperly cited the 2004 findings of neglect as grounds for termination, the error was one of form and we will not frustrate the purpose of RSA chapter 170-C by elevating form over substance. *See, e.g., State v. Gallagher*, 157 N.H. 421, 425 (2008); *cf. In re Robyn W.*, 124 N.H. 377, 381 (1983) (declining to treat as jurisdictional the court's failure to observe sixty-day period for the disposition of parental rights termination petition). DCYF complied with RSA 170-C:5, III by obtaining the 2007 findings of abuse and neglect prior to initiating the termination action. It also cited the 2007 findings in its termination petitions and detailed in its allegations how the same behavioral pattern resulted in both the 2004 and 2007 findings. Finally, the substance of the family division's ruling — that, beyond a reasonable doubt, S.G. failed to keep violent, abusive men away from Zachary and Kandace — applies to the 2004 *and* 2007 findings because they were the product of the same *condition. See* RSA 170-C:5, III (providing termination warranted for failure "to correct the *conditions* leading to" finding of neglect (emphasis added)).

■ ■ S.G. next argues that the termination petitions were premature. While we agree that DCYF's May 2007 petitions to terminate S.G.'s parental rights were premature because, when filed, twelve months had not elapsed since the January 2007 findings of neglect, we reject S.G.'s argument because she in fact received twelve months to correct the conditions. *Cf. McIntire v. Lee*, 149 N.H. 160, 167 (2003) (noting that judgment will not be disturbed where court can see from entire record that no injury has been done); *In re Billy T.*, 124 N.H. 576, 579 (1984) (affirming termination of parental rights because no prejudice suffered by untimely disposition and to allow relitigation antithetical to interest of child). The family division neither began the termination hearing nor issued a termination decree until twelve months after the January 2007 findings of neglect. Furthermore, the family division found that DCYF made reasonable efforts towards reunification during this twelve-month period and S.G. does not challenge this finding. We therefore turn to the parties' arguments concerning the sufficiency of evidence.

■ The court ordered termination based upon a lack of reasonable assurance that S.G. corrected the children's exposure to violent, abusive men. Its order was based upon the following.

Gail Colpas related her observations while assisting S.G. as an assessment worker for DCYF in both the 2004 and 2006 actions. She observed Zachary's bruising in 2004, contacted police after S.G. informed her that A.G. caused it, and counseled S.G. about the need to keep A.G. away from the children. Colpas filed the 2006 petitions after Zachary informed her

that A.G. hit him in their home. She further testified that Kandace witnessed the incident. Although S.G. took the children to the police department following this incident, Colpas testified that S.G. was unwilling to provide police with information about A.G.'s employment or residence. When Colpas asked S.G. why she did not remove A.G. from the home, S.G. responded: "[T]he best way to handle it is just to ignore him."

Stuart Scott worked with Zachary and Kandace as a reunification worker for the Claremont District Office of DCYF between the spring of 2004 and the fall of 2006. He believed S.G. and A.G. "were in very close contact throughout the case, despite orders of protection and despite what both sides were telling [him]." Equally troubling was that, while regularly in the home to help S.G., Scott encountered O.L., a live-in boyfriend of S.G., who he believed was not safe to have around the children. This was because Zachary once indicated that O.L. caused bruising on his forehead by lifting him into the ceiling fan. Scott testified about another incident involving O.L. throwing a suitcase at Zachary. Scott also testified about an unannounced visit where he found O.L. home alone with the children despite an order of protection against him.

While Scott acknowledged that S.G. was actively involved in counseling programs, he harbored concerns about her progress because she "continued to not understand why so much was asked of her" and disputed that she had done anything wrong. He testified that "[s]he would never take responsibility for her involvement in the case." While Scott at one point changed his opinion in favor of reunification because S.G. was doing well with parenting classes, he changed his mind after S.G. told him that she "had been telling her therapist things that the therapist had wanted to hear, and she didn't really believe in what was going on with therapy."

Child Protective Service Worker Amanda Cutter became involved with the case around November 2005 when the children were in the process of reunification. She had concerns about reunification because, based upon statements made by S.G., Cutter believed that S.G. still "felt strongly that [A.G.] could continue or should see the children." Nevertheless, Cutter ultimately moved to close the first case. After the first action was closed, Cutter received a call from Zachary's therapist because Zachary was again seeing A.G. She later became involved in this action and conceded at the final hearing that reunification may have compromised the children's safety.

Dr. Kathleen Corcoran, a child therapist who specializes in treating children with post-trauma reactions, worked with Zachary starting in August or September 2006. Zachary "presented with moderate to severe PTSD, primarily hypervigilance; worried about his safety; was looking for danger around every corner; difficulty sleeping; impulsivity; nightmares; all

kinds of worries; low self-esteem." Corcoran explained the negative influence of A.G.'s presence in the home. She testified that Zachary avoided sleeping near windows for fear "that his dad was going to come in through the window in the middle of the night." In her opinion, remaining at home with risk of exposure to A.G. was of great concern given Zachary's continuing fear and his statement "that his mother was supposed to protect him from being harmed and that she was not able to do so." Concerning future contact with A.G., she testified:

> My concern with Zach has been he has said that he feels like he can't trust anyone to protect him. He had wished that his mother would protect him but she didn't; that he's been so angry at his father that he wanted him to die; and that he — it's very hard for him to feel safe . . . .

Sally Avery, parent aide for Southwestern Community Services, worked with S.G. on parenting strategies beginning around May 2007. Even though S.G. had made progress in her opinion, Avery still had concerns about the children's safety and S.G.'s ability to recognize the emotional and physical harm abusive men can visit upon Zachary and Kandace.

CPSW Mark Simino began working as the case manager in May or June of 2007. He testified that S.G. made progress in parenting strategies up to August 2007. He then began having reservations about unsupervised visits, and in mid-December he saw A.G. enter S.G.'s apartment building. Finally, Simono explained that although DCYF's original plan for S.G. was reunification, DCYF later switched to termination and adoption as the permanency plan because he still could not "state or justify that these kids will not be harmed in the future."

The GAL, who was first appointed in the summer of 2005, testified that S.G. said early in the case that she believed the children should have a relationship with their father, and that she needed A.G. "because he was someone who could control Zachary." At a December 2005 meeting, during the period of reunification in the first action, S.G. left whether the children would see A.G. up to the GAL. At a team meeting convened after Simino observed A.G. entering S.G.'s apartment building, the GAL recommended visitation between S.G. and the children occur outside S.G.'s home for fear that Zachary would see A.G. In response, S.G. "stood up and swore and stomped out of the meeting and said, no way, I have my rights." The GAL found this reaction troubling because it again demonstrated S.G.'s failure to appreciate the importance of protecting Zachary over "her rights and her inconvenience at having visits elsewhere."

Although S.G. is now divorced from A.G. and claims to recognize the threat he poses to the children, other witnesses described several recent

occasions of seeing A.G. and S.G. together, including testimony that A.G. began coming to S.G.'s apartment in February 2008 and had been there every day and night.

This evidence supports the family division's finding that S.G. had, beyond a reasonable doubt, failed to correct the conditions leading to the findings of neglect. *See* RSA 170-C:5, III.

## B. Best Interests

After the court finds statutory grounds for termination, it must further consider whether termination is in the children's best interest. *See Antonio W.*, 147 N.H. at 412. The children's welfare is the "dominant consideration . . . , which must prevail over the interests of the parents." *Id.* "The conclusion of what is in the child's best interest is not an evidentiary fact, however, and is not required to be established by the standard of beyond a reasonable doubt." *In re Shannon M.*, 146 N.H. 22, 28 (2001) (quotation omitted). "Rather, the conclusion concerns which of the possible alternative dispositional orders is the most desirable, under a standard giving priority to the assumed interest of the child." *Id.* (quotation omitted). We will not disturb the trial court's finding unless unsupported by the evidence or plainly erroneous as a matter of law. *Antonio W.*, 147 N.H. at 412.

With respect to the children's best interests, the court found:

> These children, whose ages are 90 months and 70 months, have been in placement about 36 months, over forty and fifty [percent], respectively, of their entire lives. There is an open neglect case against [S.G.] There was no suggestion during the five days of hearings in this matter that the children might be returned to her in the near future. They need and deserve stability and freedom from fear in order to thrive and become productive and happy adolescents and adults. They have waited long enough for that promise to be delivered upon.

The evidence sufficiently supported this finding. Zachary and Kandace had been in multiple out of home placements for a prolonged period. Corcoran concluded Zachary was "going to need years in a very safe, very nurturing environment before he can really calm down and settle down and feel safe." Although Corcoran conceded that terminating S.G.'s parental rights would trigger a grieving process, she ultimately noted that permanency was paramount.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.