NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court - Merrimack Family Division
No. 2014-308


IN RE G. B.

Argued:  September 18, 2014
Opinion Issued:  November 7, 2014


Valerie C. Raudonis, of Nashua, by brief and orally, for the petitioners.


Lucinda Hopkins, of Manchester, by brief and orally, for the respondent.


HICKS, J.  The respondent, G. B., II (father), appeals an order of the Circuit Court (Stephen, J.) terminating his parental rights over his son, G. B., III (child).  We affirm.

The following facts were found by the trial court or are supported by the record.  In September 2008, the father was arrested after making arrangements with an undercover state trooper to pay to have the child's mother, Michelle H., murdered.  The father pleaded guilty to a class A felony indictment for criminal solicitation to commit murder as principal and/or accomplice.  See RSA 629:2 (2007), 626:8 (2007).  He is currently serving an eight-to-twenty year prison sentence, with an early release date of August 16, 2016.

On September 2, 2009, Michelle H. died.  It appears that at that point, guardianship over the child was granted to either his maternal grandfather, or both of his maternal grandparents, although no certificate of appointment appears in the record.

In February 2012, the petitioners, Robert H. and his wife Carolyn H., petitioned for guardianship over the child. The record indicates that Robert is Michelle H.'s cousin. In their ex parte motion to grant their petition for guardianship, the petitioners alleged that the child's grandfather had been hospitalized after suffering a massive heart attack and was unable to care for the child. They also alleged that the child's grandmother was unable to care for him due to "her own medical problems and limitations." The petitioners were appointed temporary guardians on February 15, 2012. According to the report of the guardian ad litem (GAL) in this case, the child's grandfather died in February 2012 and his grandmother died in July of that year; in the meantime, in March 2012, the petitioners were appointed permanent guardians.

On or about July 13, 2012, the petitioners filed a petition against the father for termination of parental rights (TPR) over the child on grounds of abandonment; failure to support, educate or care for the child; and conviction of attempt or solicitation to murder Michelle H. See RSA 170-C:5, I, II, VII(c) (2014). The petitioners alleged that they wished to adopt the child.

The trial court terminated the father's parental rights on grounds of attempt to commit murder and failure to support, educate and care for the child. The father appeals, arguing that: (1) the trial court lacked jurisdiction to terminate his parental rights; (2) the petitioners did not prove beyond a reasonable doubt that the father failed to support the child despite being financially able to do so; (3) the evidence did not support termination of the father's parental rights on the ground of abandonment; and (4) termination of the father's parental rights was not in the child's best interest when it was contrary to his deceased mother's wishes and was not necessary for the child's welfare.

"A court may not order the termination of parental rights unless the petitioning party proves a statutory ground for termination beyond a reasonable doubt." In re Deven O., 165 N.H. 685, 689 (2013). "We will not disturb a trial court's finding that a ground for termination has been proved unless it is unsupported by the evidence or plainly erroneous as a matter of law." Id. at 693. "After the court finds statutory grounds for termination, it must further consider whether termination is in the [child's] best interest." In re Zachary G., 159 N.H. 146, 157 (2009). Such a determination requires assessment of which of the possible alternative dispositional orders is the most desirable, under a standard giving priority to the assumed interest of the child. Id. "We will not disturb the trial court's finding unless unsupported by the evidence or plainly erroneous as a matter of law." Id. Finally, whether the circuit court had subject matter jurisdiction in this case is a question of law subject to de novo review. In the Matter of Mallett & Mallett, 163 N.H. 202, 207 (2012).

The father first argues that the trial court lacked subject matter jurisdiction to terminate his parental rights because the child had been residing in Massachusetts with Robert and Carolyn since they obtained temporary guardianship over him in February 2012.  The father relies upon RSA 170-C:3, which provides, in pertinent part:  "The probate court shall have exclusive <u>original</u> jurisdiction over petitions to terminate the parent-child relationship when the child involved is present in the state or is in the legal custody or legal guardianship of an authorized agency located in the state."  RSA 170-C:3 (2014)(emphasis added); <u>see also</u> RSA 490-F:3 (Supp. 2013) (providing, in part, that "[t]he circuit court shall have the jurisdiction, powers, and duties conferred upon the former probate . . . courts").

It appears that the father correctly contends that neither of the conditions upon which jurisdiction under RSA 170-C:3 could be predicated – physical presence or the requisite custody or guardianship – existed at the time the petition for termination of parental rights was filed.  Nevertheless, the petitioners assert that "[t]he applicable statutory authority is the Uniform Child Custody Jurisdiction [and] Enforcement Act (UCCJEA)."  <u>See</u> RSA ch. 458-A (Supp. 2013) (Uniform Child Custody Jurisdiction and Enforcement Act as adopted in New Hampshire).  They assert two grounds supporting jurisdiction under the UCCJEA:  (1) that the circuit court "has exercised jurisdiction over and entered several orders concerning the legal custody and legal guardianship of [the child] from 2009 until . . . the court order to terminate parental rights . . . [which is] the subject of this appeal"; and (2) that New Hampshire is the child's "home state" under the UCCJEA as of the date of filing the petition to terminate the father's parental rights.  <u>See</u> RSA 458-A:1, VII.  Because we agree that the first basis supports jurisdiction under the UCCJEA, we decline to address the second.  In addition, as this case presents an issue of first impression, we look to decisions of other jurisdictions for guidance.

The UCCJEA governs when a court of this state has jurisdiction to make or modify a child custody determination.  <u>See</u> RSA 458-A:12-:15.  "Child custody determination" is defined, in relevant part, to mean "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child."  RSA 458-A:1, III.  We hold that a TPR decision is a child custody determination for purposes of the UCCJEA. <u>See</u> RSA 458-A:1, IV (defining "[c]hild-custody proceeding" to mean, in relevant part, "[a] proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue . . . includ[ing] a proceeding for . . . termination of parental rights"); <u>In re Welfare of Children of D.M.T.-R.</u>, 802 N.W.2d 759, 763 (Minn. Ct. App. 2011) (stating that "[u]nder the UCCJEA, a 'child custody determination' includes determinations made in . . . TPR proceedings"); <u>In re J.C.B.</u>, 209 S.W.3d 821, 824 (Tex. App. 2006) (noting that "actions to terminate parental rights fall within the scope of child custody determinations").

The TPR decision in this case was not the initial child custody determination for purposes of the UCCJEA.  See RSA 458-A:1, VIII (defining "[i]nitial determination" to mean "the first child-custody determination concerning a particular child").  The initial child custody determination was the appointment of the child's maternal grandfather, or both maternal grandparents, as his guardian(s) following Michelle H.'s death.  Although we were not provided the certificate of appointment, references in the record to a Merrimack Family Division 2009 docket number indicate, and the parties do not dispute, that the initial custody determination was made by a New Hampshire court.  Accordingly, we must determine whether the circuit court retained jurisdiction, pursuant to the UCCJEA, to make a TPR determination with respect to the child.

RSA 458-A:13, I provides:

I.  Except as otherwise provided in RSA 458-A:15 [dealing with temporary emergency jurisdiction], a court of this state which has made a child-custody determination consistent with RSA 458-A:12 [providing for jurisdiction to make initial child-custody determination] or RSA 458-A:14 [dealing with jurisdiction to modify a child custody determination made by a court of another state] has exclusive, continuing jurisdiction over the determination until:

(a) A court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

(b) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

RSA 458-A:13, I (emphasis added).  We note that for purposes of the UCCJEA, the TPR determination in this case is considered a modification of the previous guardianship determinations because it was "made after a previous determination concerning the same child."  RSA 458-A:1, XI (defining "[m]odification" to mean "a child-custody determination that changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination").

It has not been demonstrated that any of the determinations enumerated in subparagraphs (a) or (b) have been made in this case.  As the petitioners

4

argue, the child "had resided [in New Hampshire] for at least the five years previous to filing the subject Petition For Termination Of Parental Rights, except for the 5 months [in Massachusetts] with [the petitioners] . . . . Virtually all of the information relating to the child is located in New Hampshire." Thus, the circuit court had continuing jurisdiction. In addition, as the father is presently incarcerated in New Hampshire, he still resides here.

We note that this case is nearly on all fours with In re H.L.A.D., 646 S.E.2d 425 (N.C. Ct. App. 2007), aff'd, 655 S.E.2d 712 (N.C. 2008), in which the court summarized its principal holding as follows:

> When a court of this State, in an initial custody order, awards custody of a child to custodial guardians who thereafter move out of North Carolina, the courts of this State maintain exclusive, continuing jurisdiction pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act when the guardians file a petition, in a separate action, for the termination of parental rights.

In re H.L.A.D., 646 S.E.2d at 428.

In H.L.A.D., the father appealed the termination of his parental rights over his daughter, arguing that because the child resided out of state when the petition was filed, the trial court lacked subject matter jurisdiction under a statute that provided:

> "[T]he court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of the filing of the petition or motion."

Id. at 429 (quoting N.C. Gen. Stat. § 7B-1101 (2005) (amended 2007)). The appellate court affirmed, concluding that the trial court had exclusive, continuing jurisdiction under the UCCJEA. See id. at 432. Noting the distinction between exclusive, original jurisdiction and exclusive, continuing jurisdiction, the court explained that the grant of exclusive, original jurisdiction to the district court under N.C. Gen. Stat. § 7B-1101, "when the circumstances specified [in that statute] . . . exist[,] . . . does not preclude the district court's exercise of jurisdiction in circumstances in which the court already has 'exclusive, continuing jurisdiction' pursuant to the UCCJEA." Id. at 430.

We similarly note that RSA 170-C:3 and RSA 458-A:13, I, independently grant jurisdiction under the circumstances set forth in each. That jurisdiction under one is not supported on a given set of facts does not preclude

jurisdiction under the other.  We conclude that the trial court had continuing subject matter jurisdiction under RSA 458-A:13, I, to terminate the father's parental rights over the child.

We address the father's next two arguments together.  He contends that the petitioners did not prove beyond a reasonable doubt the statutory TPR grounds of failure to support and abandonment.  We need not determine whether these grounds were proved, however, because the trial court found that a third ground was proved, and the father does not challenge that finding on appeal.  Specifically, the court found that "a statutory basis exists under [RSA 170-C:5, VII(c)] which includes attempt to commit murder."  We find it to be of no moment that the court cited attempt rather than solicitation to commit murder, the latter being the offense of which the father stands convicted, because both offenses are included in RSA 170-C:5, VII(c) and the father's record of conviction adequately supports the solicitation ground.  We further note that in his motion for reconsideration before the trial court, the father stated:  "As to the Court's finding that [the father's] rights may be terminated under the grounds as set forth in . . . [RSA 170-C:5, VII(c)] he concedes that he has no defense to those particular grounds."  Because a TPR "petition may be granted where the court finds that <u>one</u> or more" of the listed statutory grounds exist, RSA 170-C:5 (2014) (emphasis added), the father's second and third contentions on appeal, even if true, would provide no basis for reversal.

Finally, the father argues that the best interest of the child does not support terminating the father's parental rights.  His challenge is essentially two pronged:  first, he contends that termination was contrary to Michelle H.'s wishes, and, second, he argues that termination was not necessary to protect the child's welfare.  We address each in turn.

The father asserts that Michelle H., "before her death, wanted the child to have an ongoing relationship with his father" and "encouraged and promoted this relationship by frequently transporting the child to prison, by making known the importance of the relationship in her letters, and by arranging escorts to transport the child to prison when she was too ill to do so herself." He argues that "[i]n determining the child's best interests, the mother's wishes for her child should carry considerable weight, especially where the child's security and safety are intact."

We decline to determine what, if any, weight a mother's wishes for her child should be given in a best interest analysis.  Rather, we reiterate our well settled law that "[t]he dominant consideration in termination proceedings . . . is the welfare of the child, <u>which prevails over the interests of the parents</u>."  <u>In re Adam R.</u>, 159 N.H. 788, 792 (2010) (emphasis added).  "The conclusion of what is in the child's best interest . . . concerns which of the possible alternative dispositional orders is the most desirable, <u>under a standard giving priority to</u>

the assumed interest of the child." In re Shannon M., 146 N.H. 22, 28 (2001) (emphasis added) (quotation omitted).

The trial court acknowledged that "Michelle wanted [the father and the child] to have a relationship." The court noted that "after [the father's] incarceration the record demonstrates that Michelle attempted to reconcile with [him] and felt it was important that [the child] be in his life to some degree." The court found, however, that "a lot has changed since that time." Specifically, the child was "thriving" in the home of the petitioners, with whom, the GAL found, he was "'very bonded.'" The court noted that the child was doing well in school and was involved in sports and scouts. It also noted the GAL's observation that the child was a "happy child" who "very much wants to be adopted by the [petitioners]. He explains his reasons simply and eloquently: they take care of me, they love me and I love them." (Quotations omitted.) The father has shown no error in the trial court's implicit finding that the child's interests prevailed over the acknowledged wishes of his mother.

The father finally contends that termination of his parental rights was not necessary to protect the child's "safety, security, and welfare" where the father had consented to the petitioners' guardianship of the child and he is "not seeking to undo [the] guardianship" when he is released from prison. The father specifically challenges, as unsupported by the evidence, the following observation in the trial court's order:

> [T]he Court is gravely concerned for the welfare of [the child] if he is placed in [the father's] custody after he is released from prison. It will be very difficult for [the father] when he is released. It will be difficult for him to find employment and/or redevelop his trade and build clientele. He will face obstacles which may create financial burdens especially on someone raising a young child.

The father argues that "[t]he record does not show that the child will be placed in the father's custody; on the contrary the record shows that the father supported the permanent guardianship and upon his release did not intend to contest the guardianship."

The father likens this case to In re William A., 142 N.H. 598 (1998), in which we held that the termination of the mother's parental rights was not necessary to ensure a stable and secure environment for the child, who was in the custody of his natural father and the father's wife. In re William A., 142 N.H. at 600. The father in William A. sought to terminate the mother's parental rights so that his wife could adopt the child. Id. Nevertheless, the wife "expressed a willingness to permit visitation between [the child and the mother]" and the father "indicated that he, too, would be willing to allow [the mother] continued visitation with [the child], provided that the visits occurred at his home." Id. In addition, the mother consented to the stepmother's

appointment as the child's legal guardian.  Id. at 602.  In concluding that termination of the mother's parental rights was not necessary to ensure the child's stable and secure environment, we stated that "[t]he record does not reflect any effort by [the mother] to reacquire legal or physical custody of her son.  She merely wanted the right to visit him.  The GAL testified that such visitation was consistent with [the child's] best interests, and the stepmother supported this view."  Id. at 601.

The facts of this case differ.  The father did not "continuously giv[e] the child to other persons for long periods of time to care for," id. (quotation omitted), as did the mother in William A., see id. at 599 (noting that the first such placement by mother, shortly after child's birth, was with family friends nearby so she could finish high school); rather, he solicited another to murder the child's mother.  As the trial court stated:  "[T]here are some decisions in life one makes that have significant consequences.  The decision to hire someone to murder your child's mother is one of those examples, especially when coupled with all the other factors in this case calling for termination."  In addition, here, in contrast to William A., the GAL opined that "it is in [the child's] best interests to terminate his father's rights and that he be adopted by" the petitioners.

Finally, as for the record "not show[ing] that the child will be placed in the father's custody," but, rather, showing that the father, "upon his release[,] did not intend to contest the guardianship," we note that the father's testimony indicated only that he did not intend to seek custody right away.  He acknowledged that it would take him some time after his release from prison to "reestablish [his] life and be capable of caring for [the child]," and that he would "be on parole for a considerable amount of time."  He then concluded:  "So initially I wouldn't be seeking any kind of having custody of him when I got out."  (Emphasis added.)  Accordingly, we find no error in the trial court voicing its concern about the possibility of the father having custody of the child.

Ultimately, the trial court was required to determine "which of the possible alternative dispositional orders is the most desirable."  In re Shannon M., 146 N.H. at 28 (quotation omitted).  The court found that the child was flourishing in his "pre-adoptive home" with the petitioners, a home that it noted "appears to be a loving environment and offers the best opportunity to provide a solid foundation for [the child's] future."  The court also found that "[t]hrough the love and support of [the petitioners], [the child] is in a family that offers him the best chance of future success."  We are not persuaded that the trial court's best interest finding is "unsupported by the evidence or plainly erroneous as a matter of law."  In re Zachary G., 159 N.H. at 157.

Affirmed.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.

8