NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

1st Circuit-Berlin Family Division
Nos.  2020-0528
      2020-0546
      2020-0548

IN RE S.A. & a.

Argued: May 12, 2021
Opinion Issued: June 18, 2021

Office of the Attorney General, (Laura E. B. Lombardi, senior assistant attorney general, on the memorandum of law and orally), for the New Hampshire Division for Children, Youth and Families.

Maureen Soraghan, of Glen, on the brief and orally, for the mother.

Jorel V. Booker, of Dover, on the brief and orally, for the father of S.A.

The Young Law Firm, of Conway (Robert Young on the brief and orally), for the father of A.G.

HANTZ MARCONI, J.  In these consolidated appeals, the mother of S.A., B.T., and A.G., the father of A.G., and the father of S.A. appeal an order of the Circuit Court (Greenhalgh, J.) terminating their parental rights over their children because they each failed to correct the conditions that led to a finding

of neglect within twelve months of that finding.  See RSA 170-C:5, III (2014).  We affirm in part, reverse in part, and remand.

Before the trial court may terminate a parent's rights on the petition of the New Hampshire Division for Children, Youth and Families (DCYF), DCYF must prove a statutory ground for terminating parental rights beyond a reasonable doubt.  In re Juvenile 2006-674, 156 N.H. 1, 4 (2007); RSA 170-C:10 (Supp. 2020).  One such ground is the parent's failure, "subsequent to a finding of child neglect . . . under RSA 169-C, . . . to correct the conditions leading to [the] finding within 12 months of the finding despite reasonable efforts under the direction of the [circuit] court to rectify the conditions."  RSA 170-C:5, III; see RSA 490-D:2, IX (2010) (granting judicial branch family division jurisdiction to terminate parental rights); RSA 490-F:3 (Supp. 2020) (granting circuit court jurisdiction conferred upon former judicial branch family division and former district courts).  Whether a parent has complied with dispositional orders in a neglect case is a non-dispositive factor that the trial court may consider in determining whether the parent has corrected the conditions of neglect.  In re Haley K., 163 N.H. 247, 251 (2012).

In assessing the State's efforts to assist the parent in rectifying the conditions, the trial court must consider whether the services provided have been accessible, available, and appropriate.  In re Juvenile 2006-833, 156 N.H. 482, 486 (2007).  "However, we have recognized that the State's ability to provide adequate services is constrained by its staff and financial limitations."  In re Michael E., 162 N.H. 520, 524 (2011).  "Thus, the State must put forth reasonable efforts given its available staff and financial resources to maintain the legal bond between parent and child."  Id. (quotation omitted).  "The word reasonable is the linchpin on which [DCYF's] efforts in a particular set of circumstances are to be adjudged."  Id. at 524-25 (quotation omitted).  DCYF's role in neglect cases is not to assume the full weight of the parent's responsibilities, but to provide the parent assistance to deal with and correct problems.  Id. at 525.  "Reasonable efforts means doing everything reasonable, not everything possible."  Juvenile 2006-833, 156 N.H. at 487 (quotation omitted).

Once a statutory ground for termination of parental rights is established, the court must then consider whether termination, or some alternative dispositional order, is in the child's best interest.  In re Sophia-Marie H., 165 N.H. 332, 336 (2013).  The dominant consideration is the welfare of the child, which prevails over the interests of the parent.  In re Adam R., 159 N.H. 788, 792 (2010).

We will not disturb the trial court's findings unless they are unsupported by the evidence or plainly erroneous as a matter of law.  In re Zachary G., 159 N.H. 146, 153 (2009).  In reviewing its findings, we are mindful that the trial court "is in the best position to assess and weigh the evidence before it," and

that "our task is not to determine whether we would have found differently[,] . . . [but] whether a reasonable person could have found as the trial judge did." In re Juvenile 2005-426, 154 N.H. 336, 339 (2006).

I.  Mother's Appeal

    A.  Facts

    The following facts relating specifically to the mother either were found by the trial court or reflect the content of documents in the record.  The abuse/neglect proceedings related to S.A. and B.T. began in May 2018; the abuse/neglect proceedings related to A.G began in August 2018.  The proceedings related to S.A. and B.T were separate from those related to A.G. until the permanency hearing, when the proceedings were combined.

        1.  S.A. and B.T. – Pre-Permanency

    On May 30, 2018, the trial court issued an ex parte order finding reasonable cause to believe that S.A. and B.T. were in imminent danger because they lived in unsanitary conditions, were at risk of losing their housing, were without adequate nutrition and supervision, and had been inappropriately and violently disciplined.  That same day, DCYF brought a petition for abuse/neglect against the mother.  S.A. and B.T. were removed from the mother's home on May 31.  On June 27, the court issued a consent order, reviewing and approving the mother's consent to a finding that she neglected S.A. and B.T. because she had failed to "provide the proper parental care and control . . . necessary for [their] physical, mental, or emotional health."

    The court held a dispositional hearing on July 30, ruling that the children would not be returned to the mother's home because, at that time, she was homeless and was "unable to provide for her children's safety."  The court ruled that the mother needed "to obtain appropriate housing," become employed if she were physically and mentally able to do so and to obtain available benefits if she were unable to work, protect the children "from excessive physical discipline," adequately supervise them, "learn appropriate non-violent discipline," and "address her own unmet mental health needs."  To address these problems, the mother was ordered to, among other things, "obtain appropriate housing and an adequate income to support herself and [her] children," "meaningfully participate in mental health counseling," and "learn adequate parenting skills."  The mother was also ordered to "follow the DCYF case plan and comply with all orders of the court."  To help the mother achieve these goals, DCYF was ordered to provide the mother with "case monitoring and management, individual and/or family counseling, referrals to

3

appropriate community services . . . , ancillary services (transportation assistance, parent aide, facilitated visitation, . . .) as available and deemed necessary by DCYF."

At the three-month review hearing in October 2018, the mother was found to have partially complied with the dispositional orders in that she had moved into an apartment, had begun to cooperate with DCYF, attended and prepared for visits with the children, was scheduled to undergo a psychological evaluation, and had completed a 10-hour parenting training. However, DCYF reported that the mother was not fully engaged with S.A., had an "inappropriate idea of what is an age appropriate behavior," and was inconsistent in her phone communication with the children. As a result, the court continued the children's placement outside of the home.

In November 2018, the mother's husband was joined as a party to the abuse/neglect proceeding. At the six-month review hearing in February 2019, the mother again was found to be in partial compliance with the dispositional orders. The court found that, at the monthly home visits during the review period, the mother's home was observed "to be in disarray and dirty." The court further found that the mother's visits with S.A. had been suspended as recommended by medical and mental health providers. The mother's visits with S.A. resumed as of March 2019.

At the nine-month review hearing in May 2019, the mother was again found to be in only partial compliance with the dispositional orders. DCYF reported that the mother's home was observed to be "increasingly deplorable and nearly uninhabitable." The court found that the mother did not consistently cooperate with DCYF or service providers, was not participating in parenting classes, and only attended counseling sporadically. In March 2019, the mother reportedly told a DCYF caseworker that she "just took the parenting class . . . to get [DCYF] off [her] back." The court also found that she continued to demonstrate "poor decision-making" as it related to the children.

The facilitated visits of the mother's husband were suspended in April 2019 due to his ongoing emotional dysregulation, inappropriate behaviors, threats, and involvement in a domestic violence incident with the mother. In July 2019, a DCYF caseworker met with the mother's husband so that he could sign releases. He appeared emotionally dysregulated. His fists were clenched and shaking, and his attorney had to intervene.

The court held a pre-permanency hearing in August 2019, at which the court found that the mother remained in partial compliance with the dispositional orders, having failed to consistently participate in counseling and maintain an appropriate home environment for the children. The court found that the mother was not consistently addressing her mental health issues and that she lived with her husband, who also did not address his own mental

4

health issues.  As a result, the court determined that the mother had "not yet demonstrated that she [could] provide a safe and sanitary home environment free from exposure to mentally unstable individuals."

### 2.  A.G. – Pre-Permanency

In May 2018, the trial court granted A.G.'s father sole residential responsibility for the child and allowed the mother to have supervised visitation with the child without her husband present.  At the end of July 2018, a local police department received a report that the mother and her husband had unsupervised parenting time with A.G.  On August 3, 2018, the mother informed DCYF that the child had been staying with her and her husband.  That day, the trial court issued an ex parte order finding that, in leaving the child with the mother, A.G.'s father had impermissibly allowed the mother to have unsupervised time with A.G., which was contrary to the prior court order, and that the mother had impermissibly allowed the child to be with her husband.  The court further found that because the mother had "failed to protect her children from excessive, sometimes violent, physical discipline inflicted by her husband," and because she was homeless, there was reasonable cause to believe that A.G. was in imminent danger if left in the care of the mother.  A.G. was then placed in an out-of-home placement.

A petition for abuse/neglect was brought against the mother on August 7, 2018.  On September 18, 2018, the court found that the mother neglected the child because of her "inability or unwillingness to protect her child from [her husband's] excessive, sometimes violent, physical discipline; inability or unwillingness to provide adequate supervision and appropriate non-violent discipline and a safe, sanitary stable home," which "place[d] [A.G.]'s life, health and welfare at risk of serious impairment."

Following a dispositional hearing in October 2018, the court ordered the mother to "participate in a psychological evaluation and consistently follow the recommendations of the evaluator," "maintain a home that is safe and sanitary," and "follow the DCYF case plan and work cooperatively with her [caseworker] as well as her individual therapist, psychological evaluator, [and] service providers."  To assist the mother, DCYF was ordered to provide her with "case monitoring and management, individual and/or family counseling, drug testing, referrals to appropriate community services, and ancillary services (transportation assistance, parent aide, intensive in-home or other . . . services) as available and deemed necessary by DCYF."

At the three-month review hearing in February 2019, the mother was found to be in partial compliance with the dispositional orders because she had moved into an apartment and worked cooperatively with DCYF and service providers.  However, the mother's home was observed to be "in disarray and dirty," and the parent educator expressed concerns about her visits with A.G.

As of the three-month review hearing, the mother had been evaluated by a psychologist and was participating in individual therapy to address "her emotions and other mental health needs."

At the six-month review hearing in May 2019, the mother was again found in partial compliance with the dispositional orders. During this review time, her home was observed to be in "increasingly deplorable and nearly uninhabitable" condition. The trial court found that the mother did not consistently cooperate with DCYF and service providers, had not participated in parenting classes, and attended counseling only sporadically. The trial court further found that on April 30, 2019, the mother and her husband were involved in a domestic dispute in which he threw a container of soda, in anger, in the direction of her and their baby; this child is not the subject of this appeal. At the nine-month review hearing in August 2019, the mother remained in partial compliance with the dispositional orders.

### 3. Permanency and Termination As To All Three Children

The court held a permanency hearing regarding S.A., B.T., and A.G. in November 2019. The court found that the mother was still only partially compliant with the dispositional orders. Although the mother participated in DCYF-facilitated visits, she had attended only one counseling session, failed to participate in ongoing formal parent education as recommended, and continued to struggle to maintain a clean home and supervise her children. During one visit, a caseworker had to bring to the mother's attention that A.G., who was then two years old, "was in the process of walking out the front door onto a second story porch." The trial court ordered DCYF to file a petition to terminate the mother's parental rights.

In its supplemental order issued after the permanency hearing, the court declined to order a 90-day extension of the proceedings. The court reiterated that the mother had never been in more than partial compliance with the dispositional orders. The court further found that the mother was not fully attentive to the children when visiting with them and that she needed "continuous reminders to stay off her phone" during the visits. Although the mother contended that DCYF failed to provide her reasonable services, the court found, "to the contrary, a myriad of services were in place throughout the case to assist [her] with addressing and completing the Case Plan." Those services included "months of services from the Family Resource Center staff, modeling and directly educating her [with] regard to safety." The court acknowledged that the mother loves her children very much, but concluded that she consistently prioritizes her own needs over their needs.

The hearing on the petition to terminate the mother's parental rights was held over two days in October 2020. Based upon the evidence at the hearing, the trial court found that the mother had been "successful in some areas" of

her case plan, but had never been "able to sustain her progress" in "maintaining a safe and clean home" or in consistently caring for her children during visits. The court found that the mother never progressed to unsupervised visits, despite receiving services including case management, "supervised visitation, parenting instruction, counseling and a psychological evaluation." The court found, beyond a reasonable doubt, that the mother failed to correct the conditions that led to the neglect finding within twelve months of that finding, despite DCYF's reasonable efforts, under the court's direction. The court further found that terminating the mother's parental rights is in the best interest of all three children.

### B. Reasonable Efforts

The mother first argues that the evidence was insufficient for the trial court to have found, beyond a reasonable doubt, that DCYF made reasonable efforts to reunify her with her children. As noted above, the trial court found that the mother had "a significant number of services to assist her in meeting her case plan goals," and the record supports its finding. Based upon our review of the record, we conclude that the trial court reasonably could have found that DCYF's efforts were reasonable. See Zachary G., 159 N.H. at 153.

### C. Best Interest

The mother next asserts that terminating her parental rights was not in her children's best interest. However, the record supports the trial court's determination to the contrary. As the trial court correctly observed, according to the guardian ad litem (GAL) appointed for the children, the mother "lacks insight regarding why [her] children were removed from her care and fails to comprehend the needs of the children for a consistently safe and healthy environment." The GAL reported that the mother "minimizes or dismisses or fails to grasp the concerns that led to the removal of her children." The GAL also reported that the mother "has been unable or unwilling to consistently maintain the small apartment where she lives in a sustained clean and organized state to make it safe and healthy for children to live there." The mother's home "smelled of urine, smoke, feces and mold, has been cluttered with piles of belongings and trash (attracting cockroaches)." Before police removed the mother's dog, the mother left the dog "crated in the kitchen, malnourished and urinating on the kitchen floor." "She also had a rabbit that was permitted to run around the apartment uncaged," which would defecate on the floor. The GAL stated that the mother "appeared to place her own need to keep . . . animals above the needs of the children to have a sanitary and safe place to live and play."

Additionally, as the trial court noted, the GAL opined that the mother had not demonstrated that she was capable of providing for her children's needs. The GAL reported that, during visits with the children, the mother was

not fully engaged with them and "needed constant reminders to pay attention to where the children were and what they were doing." According to the GAL, during visits, the mother discussed "inappropriate adult matters with the children and [made] them promises that she [cannot] keep." The mother "appeared to be more focused on herself than the children when she spent time with them."

In addition, the GAL reported that the mother had demonstrated "very little understanding" of her children's need for safety by, for example, leaving an electric razor in A.G.'s reach and refusing to move it when advised to do so, allowing A.G. and B.T. to be out of her sight and near a road, and allowing the dog to defecate on the kitchen floor where she fed the children because there was no table for them.

At the termination of parental rights hearing, the caseworker opined that terminating the mother's parental rights is in the children's best interest. The caseworker testified that S.A. was living in a "loving, consistent home" that was "clean" and peaceful. The caseworker testified that B.T. was also in a "loving, stable," and "clean" home and that B.T. had a "wonderful bond" with the foster mother. As to A.G., the caseworker testified that A.G., too, was in a "stable home, a loving home, consistent home, protected and guarded home," where A.G.'s needs are being met. On the record before it, we cannot say that the trial court erred by concluding that terminating the mother's parental rights is in the children's best interest. See In re Sophia-Marie H., 165 N.H. at 338-39.

## II.  Appeal of the Father of S.A.

### A.  Facts

The father is incarcerated in Florida. According to DCYF, he has been incarcerated since 2013, when S.A. was approximately two years old. The father will not be eligible for release until 2038, when S.A. will be twenty-seven years old. On June 27, 2018, the father was adjudicated to have neglected S.A. because he "failed to provide proper parental care and control over [the child]," having left the child in the mother's care where the child was neglected. In its order issued after the July 2018 dispositional hearing, the court stated that the child was in need of "a safe, sanitary and stable home," "adequate supervision," "appropriate non-violent discipline," and protection "from excessive physical discipline." To correct the conditions that led to the neglect finding, the father needed "to provide a safe and stable home" for the child and "to follow through with his incarceration/probation requirements." The father also had to follow the DCYF case plan. DCYF was not ordered to provide any services to the father, but was ordered to provide services to the child and to the mother.

At the three-month review hearing held in October 2018, the father was found not to be in compliance with the dispositional orders. At that time, he remained incarcerated and had "made no effort to demonstrate any progress on the Dispositional Orders or case plan." The court found that DCYF had sent letters to the father along with a social study form for him to complete, but that he had "not yet returned the social study" or "provided any evidence of participating in any parenting skill programs, behavior modification groups, or any other training which may prepare him for parenting responsibilities and life outside incarceration." The court also found that the father had not provided DCYF "with any information regarding his dates of incarceration or release date." The court determined that an out-of-home placement remained required for S.A. because it was "not possible . . . for [the father] to provide a safe and stable home for the [child]."

The father was also found not to be in compliance with the dispositional orders at the six-month review hearing held in February 2019, because he remained incarcerated in a Florida prison with a release date in 2038 and had yet to provide "any evidence of participating in any parenting skill programs, behavior modification groups, or any other training." The trial court noted that the father had mailed "a number of letters and cards" to the DCYF caseworker to give to the child, but that the correspondence had "been set aside to be provided to [the child] if and when it is recommended by [the child's] medical/mental health providers." Based upon the evidence at the hearing, the trial court found that the child's continued placement outside the home was necessary because the father will remain incarcerated until August 31, 2038, had made no effort to demonstrate any progress on the dispositional orders or case plan, and because it was not possible for him to provide the child with a safe and stable home.

However, at the nine-month review hearing held in May 2019, the father was found to be in partial compliance with the dispositional orders because he had provided proof that he obtained his high school diploma and had completed several correspondence classes through the "Set Free Prison Ministries." In addition, the father identified his sister as a potential placement for the child. The court ordered that a home study "be conducted and approved pursuant to the Interstate Compact on the Placement of Children." The court ordered DCYF to "continue to provide the father . . . with updates and the opportunity to avail himself of case monitoring and management, and other services as available and deemed necessary by DCYF."

The father's sister was willing to act as a placement for the child. At DCYF's request, Florida authorities conducted a home study of the sister's home and found it to be acceptable. However, S.A. was not placed with the father's sister, but was, instead placed with the mother's sister.

At the pre-permanency hearing in August 2019, the court found that DCYF had regularly provided the father with updates and information, and that the father, who remained incarcerated, had "not been able to exhibit stable housing or any measure of appropriate parenting skills outside of incarceration." The court found him in partial compliance with the outstanding dispositional orders. DCYF was ordered to continue to provide the father "with updates and the opportunity to avail himself of case monitoring and management," and any other services "as available and deemed necessary by DCYF."

The trial court held a permanency hearing in November 2019. In its supplemental order issued thereafter, the trial court ordered DCYF to petition to terminate the father's parental rights finding that, although the father had corresponded with DCYF consistently during the case, he had been "unable to demonstrate that [the child] will not be endangered in the manner adjudicated [in] the initial petition, if returned home to [him]." Accordingly, DCYF brought a petition to terminate the father's rights with respect to S.A. under RSA 170-C:5, III.

In its narrative order issued after the October 2020 termination hearing, the court credited testimony by the DCYF caseworker that the father's "ability to comply with the case plan" was "very limited by his long term incarceration." The trial court also credited the caseworker's testimony that "he had not been clear about what parental education he expected [the father] to acquire while in prison," that the father "had taken what educational courses were available to him," and that the father had done "all he could do to foster a relationship with" the child.

Nonetheless, the trial court terminated the father's parental rights, finding that, although the father had "done what he could[] while in prison to comply with the case plan" and had kept in contact with DCYF, "his efforts did not lead to a correction of the conditions that led to [S.A.'s] neglect." The court also found that terminating the father's parental rights is in the child's best interest, observing that he will not be released from prison until S.A. is an adult, S.A. and he have no bond, and S.A. appeared "to be settled in a loving stable home" with the maternal aunt.

On appeal, the father argues that the trial court erred by finding that he failed to correct the conditions that led to the neglect finding. We agree.

We find Haley K. instructive, which, like this case, involved an incarcerated parent whose parental rights were terminated pursuant to RSA 170-C:5, III on the ground that the parent had failed to correct the conditions that led to the neglect finding. Haley K., 163 N.H. at 248-49. In Haley K., we upheld the trial court's finding that the incarcerated father had failed to correct the conditions that led to the original neglect finding because he "failed to

10

make adequate provisions for his child's care and support during his incarceration." Id. at 252. As we observed, "At the end of twelve months [he] remained incarcerated, and Haley remained in foster care because there was no other option for her placement." Id. at 251. We explained, "Much like a military parent who is deployed overseas, the [father's] physical unavailability did not absolve him of his parental obligation to provide for the care of his child." Id. at 252.

In contrast to Haley K.'s father, who "failed to make adequate provisions for her care and support during his incarceration," id., by the time of the nine-month review hearing, S.A.'s father made those provisions by identifying a suitable relative placement for S.A. While his incarceration was the result of his own doing and contributed to S.A. being without proper parental care and support, see id., S.A.'s father, unlike Haley K.'s father, provided his child with an option for permanency during his incarceration within the statutorily-mandated twelve-month period in which to correct the conditions that led to the neglect finding. See RSA 170-C:5, III; RSA 169-C:24-b, II(b) (2014) (providing that "[g]uardianship with a fit and willing relative" is an option for permanency). Under these circumstances, we hold that the trial court erred by finding that the father failed to correct the conditions that led to the neglect finding within twelve months of that finding. See RSA 170-C:5, III. We, therefore, reverse the trial court's termination of the father's parental rights.[1]

III. Appeal of the Father of A.G.

A. Facts

On August 7, 2018, DCYF brought a petition for abuse/neglect against A.G.'s father. The trial court held an adjudicatory hearing on September 18, 2018, and found that the father had neglected A.G. because his "inability or unwillingness to assure that his [child] is properly supervised and [has] a safe, sanitary stable home places [A.G.'s] life, health and welfare at risk of serious impairment."

The dispositional hearing was held in October 2018. The trial court found that the father needed "to establish an attachment/bond with his [child] . . . so that he will be able to consistently care for [the child] and meet [the child's needs for] safety, stability and overall well-being." The court ordered the father "to participate in mental health counseling in a meaningful way so as to gain skills to foster bonding" with his child, "follow recommendations made by his therapist," "maintain consistent contact[] and cooperate[] with his [caseworker]," "sign requested releases of information," "follow the DCYF Case

_____

[1] The father also argues that his "incarceration alone" may not form the basis for the termination of his rights. This petition, however, was brought pursuant to Section III, not Section VI, where that condition applies. Compare RSA 170-C:5, III with RSA 170-C:5, VI.

Plan," and "comply with all court orders." To assist the father, DCYF was ordered to provide "case monitoring and management, individual and/or family counseling, drug testing, referrals to appropriate community services, and ancillary services (transportation assistance, parent aide, intensive in-home or other . . . services, . . . ) as available and deemed necessary by DCYF."

By the time of the three-month review hearing in February 2019, the whereabouts of A.G.'s father were unknown to DCYF, although DCYF had "reason to believe he [might] have relocated to Florida." DCYF reported that it had received no communication from the father since September 2018. DCYF further reported that the father had "made no effort to comply with the DCYF case plan." The father had not completed the court-ordered social study or otherwise participated in the case. The father did not appear at the three-month review hearing, either in person or telephonically.

DCYF made the same report at the six-month review hearing in May 2019, at which the father participated telephonically. The father also participated telephonically at the nine-month review hearing in August 2019. The trial court found that the father still had made no efforts to comply with the case plan. The court found that the father had not regularly communicated with DCYF, was reportedly living in Florida, and had "chosen not to participate in this matter" since moving from New Hampshire.

The father attended the November 2019 permanency hearing, testifying that he never saw his case plan and did not know what it contained. The trial court found that the father had not complied with any of the outstanding dispositional orders. The court found that the father had "not been in touch with DCYF" and had failed to respond "to repeated attempts, phone calls and letters, to contact him." The court further found that the father had not provided support for A.G. and had not demonstrated putting A.G.'s needs ahead of his own. The court observed that the father did not request to be reunified with A.G, but rather that A.G. be placed with his stepmother, whom A.G. met for the first time on the day of the permanency hearing. Based upon the evidence at the permanency hearing, the trial court directed DCYF to file a petition to terminate the father's parental rights.

At the October 2020 hearing on the petition to terminate the father's parental rights, the father admitted that he had not been in contact with DCYF during the abuse/neglect case because he lacked time and acknowledged that he had not bonded well with A.G. and that it would be a challenge to do so. The father also admitted that he once had a copy of the case plan, but that he had since lost it. The father further admitted that, until the permanency hearing in November, he had done nothing required in his case plan. The father testified that he was unable to visit A.G. because he does not have time to do so. Based upon the evidence before it, the trial court found, beyond a reasonable doubt, that the father had failed to correct the conditions that led to

the neglect finding despite DCYF's reasonable efforts. The trial court also found that terminating the father's parental rights is in A.G.'s best interest, noting that according to the GAL, the father had "made no effort to have a relationship" with the child.

On appeal, the father challenges the trial court's finding that DCYF made reasonable efforts to reunify him with A.G. and its determination that terminating his parental rights is in A.G.'s best interest. As the appealing party, A.G.'s father has the burden of demonstrating reversible error. Gallo v. Traina, 166 N.H. 737, 740 (2014). Based upon our review of the trial court's order, the father's challenges to it, the relevant law, and the record submitted on appeal, we conclude that he has not demonstrated reversible error. See id.

IV.  Conclusion

For all of the foregoing reasons, we uphold the trial court's decision to terminate the mother's parental rights over all three children and its decision to terminate the parental rights of A.G.'s father over A.G. We reverse the trial court's decision to terminate the parental rights of S.A.'s father over S.A., and remand for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; and remanded.

HICKS, BASSETT, and DONOVAN, JJ., concurred.